RAILROAD COMPANY *v.* LOCKWOOD.

1. A common carrier cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law.

2. It is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants.

3. These rules apply both to common carriers of goods and common carriers of passengers, and with especial force to the latter.

4. They apply to the case of a drover travelling on a stock train to look after his cattle, and having a free pass for that purpose.

---

5. *Query:* Whether the same rules would apply to a strictly free passenger.

6. *Held, arguendo:* That a common carrier does not drop his character as such merely by entering into a contract for limiting his responsibility.

7. That carefulness and fidelity are *essential duties* of his employment which cannot be abdicated.

8. That these duties are as essential to the public security in his servants as in himself.

9. That a failure to fulfil these duties is "negligence," the distinction between "gross" and "ordinary" negligence being unnecessary.

ERROR to the Circuit Court for the Southern District of New York; the case being thus:

Lockwood, a drover, was injured whilst travelling on a stock train of the New York Central Railroad Company, proceeding from Buffalo to Albany, and brought this suit to recover damages for the injury. He had cattle in the train, and had been required, at Buffalo, to sign an agreement to attend to the loading, transporting, and unloading of them, and to take all risk of injury to them and of personal injury to himself, or to whomsoever went with the cattle; and he received what is called a drover's pass; that is to say, a pass certifying that he had shipped sufficient stock to pass free to Albany, but declaring that the acceptance of the pass was to be considered a waiver of all claims for damages or injuries received on the train. The agreement stated its consideration to be the carrying of the plaintiff's cattle at less than tariff rates. It was shown on the trial, that these rates were about three times the ordinary rates charged, and that no drover had cattle carried on those terms; but that all signed similar agreements to that which was signed by the plaintiff, and received similar passes. Evidence was given on the trial tending to show that the injury complained of was sustained in consequence of negligence on the part of the defendants or their servants, but they insisted that they were exempted by the terms of the contract from responsibility for all accidents, including those occurring from negligence, at least the ordinary negligence of their servants; and requested the judge so to charge. This he refused, and charged that if the jury were satisfied that the injury occurred without any negligence on the part of the plaintiff,

and that the negligence of the defendants caused the injury, they must find for the plaintiff, which they did.   Judgment being entered accordingly, the railroad company took this writ of error.

It is unnecessary to notice some subordinate points made, as this court was of opinion that all the questions of fact were fairly left to the jury, and that the whole controversy depended on the main question of law stated.

The case was elaborately argued by *Mr. T. R. Strong, for the company, plaintiff in error,* and by *Messrs. Truman Smith and Cephas Brainerd, contra,* early in the last term, with a full citation of authorities; the counsel for the plaintiff in error relying especially on the New York cases of *Welles* v. *The New York Central Railroad Company,* [*] *Perkins* v. *Same,*[†] *Smith* v. *Same,*[‡] *Bissell* v. *Same,*[§] *Poucher* v. *Same,*[||] by which he argued that the case was to be determined; those being decisions of the highest court of the State of New York, within whose jurisdiction the contract was made and to be executed, and where the alleged cause of action occurred. Being held under advisement till this term—

Mr. Justice BRADLEY delivered the opinion of the court.

It may be assumed *in limine,* that the case was one of carriage for hire; for though the pass certifies that the plaintiff was entitled to pass free, yet his passage was one of the mutual terms of the arrangement for carrying his cattle. The question is, therefore, distinctly raised, whether a railroad company carrying passengers for hire, can lawfully stipulate not to be answerable for their own or their servants' negligence in reference to such carriage.

As the duties and responsibilities of public carriers were prescribed by public policy, it has been seriously doubted whether the courts did wisely in allowing that policy to be departed from without legislative interference, by which

---

[*] 24 New York, 181; S. C. 26 Barbour, 641.   [†] 24 New York, 196.
[‡] Ib. 222; S. C. 29 Barbour, 132.
[§] 25 New York, 442; S. C. 29 Barbour, 602.   [||] 49 New York, 263.

needed 'modifications could have been introduced into the law. But the great hardship on the carrier in certain special cases, where goods of great value or subject to extra risk were delivered to him without notice of their character, and where losses happened by sheer accident without any possibility of fraud or collusion on his part, such as by collisions at sea, accidental fire, &c., led to a relaxation of the rule to the extent of authorizing certain exemptions from liability in such cases to be provided for, either by public notice brought home to the owners of the goods, or by inserting exemptions from liability in the bill of lading, or other contract of carriage. A modification of the strict rule of responsibility, exempting the carrier from liability for accidental losses, where it can be safely done, enables the carrying interest to reduce its rates of compensation; thus proportionally relieving the transportation of produce and merchandise from some of the burden with which it is loaded.

The question is, whether such modification of responsibility by notice or special contract may not be carried beyond legitimate bounds, and introduce evils against which it was the direct policy of the law to guard; whether, for example, a modification which gives license and immunity to negligence and carelessness on the part of a public carrier or his servants, is not so evidently repugnant to that policy as to be altogether null and void; or, at least null and void under certain circumstances.

In the case of sea-going vessels, Congress has, by the act of 1851, relieved ship-owners from all responsibility for loss by fire unless caused by their own design or neglect; and from responsibility for loss of money and other valuables named, unless notified of their character and value; and has limited their liability to the value of ship and freight, where losses happen by the embezzlement or other act of the master, crew, or passengers; or by collision, or any cause occurring without their privity or knowledge; but the master and crew themselves are held responsible to the parties injured by their negligence or misconduct. Similar enact-

ments have been made by State legislatures.    This seems to be the only important modification of previously existing law on the subject, which in this country has been effected by legislative interference.    And by this, it is seen, that though intended for the relief of the ship-owner, it still leaves him liable to the extent of his ship and freight for the negligence and misconduct of his employés, and liable without limit for his own negligence.

It is true that the first section of the above act relating to loss by fire has a proviso, that nothing in the act contained shall prevent the parties from making such contract as they please, extending or limiting the liability of ship-owners. This proviso, however, neither enacts nor affirms anything. It simply expresses the intent of Congress to leave the right of contracting as it stood before the act.

The courts of New York, where this case arose, for a long time resisted the attempts of common carriers to limit their common-law liability, except for the purpose of procuring a disclosure of the character and value of articles liable to extra hazard and risk.    This, they were allowed to enforce by means of a notice of non-liability, if the disclosure was not made.    But such announcements as " all baggage at the risk of the owner," and such exceptions in bills of lading as " this company will not be responsible for injuries by fire, nor for goods lost, stolen, or damaged," were held to be unavailing and void, as being against the policy of the law.[*]

But since the decision in the case of *The New Jersey Steam Navigation Company* v. *Merchants' Bank*,[†] by this court, in January Term, 1848, it has been uniformly held, as well in the courts of New York as in the Federal courts, that a common carrier may, by special contract, limit his common-law liability; although considerable diversity of opinion has existed as to the extent to which such limitation is admissible.

The case of *The New Jersey Steam Navigation Company* v.

[*] Cole *v.* Goodwin, 19 Wendell, 257 ; Gould *v.* Hill, 2 Hill, 623.
[†] 6 Howard, 344.

*Merchants' Bank*, above adverted to, grew out of the burning of the steamer Lexington. · Certain money belonging to the bank had been intrusted to Harnden's Express, to be carried to Boston, and was on board the steamer when she was destroyed. By agreement between the steamboat company and Harnden, the crate of the latter and its contents were to be at his sole risk. The court held this agreement valid, so far as to exonerate the steamboat company from the responsibility imposed by law; but not to excuse them for misconduct or negligence, which the court said it would not presume that the parties intended to include, although the terms of the contract were broad enough for that purpose; and that inasmuch as the company had undertaken to carry the goods from one place to another, they were deemed to have incurred the same degree of responsibility as that which attaches to a private person engaged casually in the like occupation, and were, therefore, bound to use ordinary care in the custody of the goods, and in their delivery, and to provide proper vehicles and means of conveyance for their transportation; and as the court was of opinion that the steamboat company had been guilty of negligence in these particulars, as well as in the management of the steamer during the fire, they held them responsible for the loss.

As this has been regarded as a leading case, we may pause for a moment to observe that the case before us seems almost precisely within the category of that decision. In that case, as in this, the contract was general, exempting the carrier from every risk and imposing it all upon the party; but the court would not presume that the parties intended to include· the negligence of the carrier or his agents in that exception.

It is strenuously insisted, however, that as negligence is the only ground of liability in the carriage of passengers, and as the contract is absolute in its terms, it must be construed to embrace negligence as well as accident, the former in reference to passengers, and both in reference to the cattle carried in the train. As this argument seems plausible, and the exclusion of a liability embraced in the terms of exemption on the ground that it could not have been in the

mind of the parties is somewhat arbitrary, we will proceed to examine the question before propounded, namely, whether common carriers may excuse themselves from liability for negligence. In doing so we shall first briefly review the course of decisions in New York, on which great stress has been laid, and which are claimed to be decisive of the question. Whilst we cannot concede this, it is, nevertheless, due to the courts of that State to examine carefully the grounds of their decision and to give them the weight which they justly deserve. We think it will be found, however, that the weight of opinion, even in New York, is not altogether on the side that favors the right of the carrier to stipulate for exemption from the consequences of his own or his servants' negligence.

The first recorded case that arose in New York after the before-mentioned decision in this court, involving the right of a carrier to limit his liability, was that of *Dorr* v. *The New Jersey Steam Navigation Company*, decided in 1850.* This case also arose out of the burning of the Lexington, under a bill of lading which excepted from the company's risk "danger of fire, water, breakage, leakage, and other accidents." Judge Campbell, delivering the opinion of the court, says: "A common carrier has in truth two distinct liabilities,—the one for losses by accident or mistake, where he is liable as an insurer; the other for losses by default or negligence, where he is answerable as an ordinary bailee. It would certainly seem reasonable that he might, by express special contract, restrict his liability as insurer; that he might protect himself against misfortune, even though public policy should require that he should not be permitted to stipulate for impunity where the loss occurs from his own default or neglect of duty. Such we understand to be the doctrine laid down in the case of *The New Jersey Steam Navigation Company* v. *The Merchants' Bank*, in 6th Howard, and such we consider to be the law in the present case." And in *Stoddard* v. *Long Island Railroad Company*,† another ex-

---

* 4 Sandford, 136.                    † 5 Id. 180.

press case, in which it was stipulated that the express company should be alone responsible for all losses, Judge Duer, for the court, says: " Conforming our decision to that of the Supreme Court of the United States, we must, therefore, hold: 1st. That the liability of the defendants as common carriers was restricted by the terms of the special agreement between them and Adams & Co., and that this restriction was valid in law.   2d.  That by the just interpretation of this agreement the defendants were not to be exonerated from all losses, but remained liable for such as might result from the wrongful acts, or the want of due care and diligence of themselves or their agents and servants.   3d. That the plaintiffs, claiming through 'Adams & Co., are bound by the special agreement."  The same view was taken in subsequent cases,* all of which show that no idea was then entertained of sanctioning exemptions of liability for negligence.

It was not till 1858, in the case of *Welles* v. *New York Central Railroad Company,*† that the Supreme Court was brought to assent to the proposition that a common carrier may stipulate against responsibility for the negligence of his servants. That was the case of a gratuitous passenger travelling on a free ticket, which exempted the company from liability.  In 1862 the Court of Appeals by a majority affirmed this judgment,‡ and in answer to the suggestion that public policy required that railroad companies should not be exonerated from the duty of carefulness in performing their important and hazardous duties, the court held that the case of free passengers could not seriously affect the incentives to carefulness, because there were very few such, compared with the great mass of the travelling public.- *Perkins* v. *The New York Central Railroad Company,*§ was also the case of a free passenger, with a similar ticket, and the court held that the indorsement exempted the company from all kinds of negligence of its agents, gross as well as ordinary; that there is, in truth, no practical distinction in the degrees of negligence.

---

* Parsons *v.* Monteath, 13 Barbour, 353 ; Moore *v.* Evans, 14 Id. 524.
† 26 Id. 641.          ‡ 24 New York, 181.          § Ib. 196.

The next cases of importance that arose in the New York courts were those of *drovers' passes*, in which the passenger took all responsibility of injury to himself and stock. The first was that of *Smith* v. *New York Central Railroad Company*,* decided in March, 1859. The contract was precisely the same as that in the present case. The damage arose from a flattened wheel in the car, which caused it to jump the track. The Supreme Court, by Hogeboom, J., held that the railroad company was liable for any injury happening to the passenger, not only by the gross negligence of the company's servants, but by ordinary negligence on their part. "For my part," says the judge, "I think not only gross negligence is not protected by the terms of the contract, but what is termed ordinary negligence, or the withholding of ordinary care, is not so protected. I think, notwithstanding the contract, the carrier is responsible for what, independent of any peculiar responsibility attached to his calling or employment, would be regarded as fault or misconduct on his part." The judge added that he thought the carrier might, by positive stipulation, relieve himself to a limited degree from the consequences of his own negligence or that of his servants. But, to accomplish that object, the contract must be clear and specific in its terms, and plainly covering such a case. Of course, this remark was extrajudicial. The judgment itself was affirmed by the Court of Appeals in 1862 by a vote of five judges to three.† Judge Wright strenuously contended that it is against public policy for a carrier of passengers, where human life is at stake, to stipulate for immunity for any want of care. "Contracts in restraint of trade are void," he says, "because they interfere with the welfare and convenience of the State; yet the State has a deep interest in protecting the lives of its citizens." He argued that it was a question affecting the public, and not alone the party who is carried. Judge Sutherland agreed in substance with Judge Wright. Two other judges held that if the party injured had been a gratuitous passenger the

---

* 29 Barbour, 132.                    † 24 New York, 222.

company would have been discharged, but in their view he was not a gratuitous passenger. One judge was for affirmance, on the ground that the negligence was that of the company itself. The remaining three judges held the contract valid to the utmost extent of exonerating the company, notwithstanding the grossest neglect on the part of its servants.

In that case, as in the one before us, the contract was general in its terms, and did not specify negligence of agents as a risk assumed by the passenger, though by its generality it included all risks.

The next case, *Bissell* v. *The New York Central Railroad Company,** first decided in September, 1859, differed from the preceding in that the ticket expressly stipulated that the railroad company should not be liable under any circumstances, " *whether of negligence by their agents, or otherwise,*" for injury to the person or stock of the passenger. The latter was killed by the express train running into the stock train, and the jury found that his death was caused by the gross negligence of the agents and servants of the defendants. The Supreme Court held that gross negligence (whether of servants or principals) cannot be excused by contract in reference to the carriage of passengers for hire, and that such a contract is against the policy of the law, and void. In December, 1862, this judgment was reversed by the Court of Appeals,† four judges against three; Judge Smith, who concurred in the judgment below, having in the meantime changed his views as to the materiality of the fact that the negligence stipulated against was that of the servants of the company, and not of the company itself. The majority now held that the ticket was a free ticket, as it purported to be, and, therefore, that the case was governed by *Welles* v. *The Central Railroad Company;* but whether so, or not, the contract was founded on a valid consideration, and the passenger was bound by it even to the assumption of the risk arising from the gross negligence of the company's servants. Elaborate opinions were read by Justice Selden in favor,

---

* 29 Barbour, 602.                    † 25 New York, 442.

and by Justice Denio against the conclusion reached by the court. The former considered that no rule of public policy forbids such contracts, because the public is amply protected by the right of every one to decline any special contract, on paying the regular fare prescribed by law, that is, the highest amount which the law allows the company to charge. In other words, unless a man chooses to pay the highest amount which the company by its charter is authorized to charge, he must submit to their terms, however onerous. Justice Denio, with much force of argument, combated this view, and insisted upon the impolicy and immorality of contracts stipulating immunity for negligence, either of servants or principals, where the lives and safety of passengers are concerned. The late case of *Poucher* v. *New York Central Railroad Company*\* is in all essential respects a similar case to this, and a similar result was reached.

These are the authorities which we are asked to follow. Cases may also be found in some of the other State courts which, by dicta or decision either favor or follow, more or less closely, the decisions in New York. A reference to the principal of them is all that is necessary here.†

A review of the cases decided by the courts of New York shows that though they have carried the power of the common carrier to make special contracts to the extent of enabling him to exonerate himself from the effects of even gross negligence, yet that this effect has never been given to a contract general in its terms. So that if we only felt bound by those precedents, we could, perhaps, find no authority for reversing the judgment in this case. But on a

---

\* 49 New York, 263.

† Ashmore *v.* Pennsylvania Steam, &c., Co., 4 Dutcher, 180; Kinney *v.* Central Railroad Co., 3 Vroom, 407; Hale *v.* New Jersey Steam Navigation Co., 15 Connecticut, 539; Peck *v.* Weeks, 34 Id. 145; Lawrence *v.* New York Railroad Co., 36 Id. 63; Kimball *v.* Rutland Railroad Co., 26 Vermont, 247; Mann *v.* Birchard, 40 Id. 326; Adams Express Co. *v.* Haynes, 42 Illinois, 89; Ib. 458; Illinois Central Railroad Co. *v.* Adams Express Co., Ib. 474; Hawkins *v.* Great Western Railroad Co., 17 Michigan, 57; S. C., 18 Id. 427; Baltimore and Ohio Railroad Co. *v.* Brady, 32 Maryland, 333; 25 Id. 128; Levering *v.* Union Transportation Co., 42 Missouri, 88.

question of general commercial law, the Federal courts administering justice in New York have equal and co-ordinate jurisdiction with the courts of that State. And in deciding a case which involves a question of such importance to the whole country; a question on which the courts of New York have expressed such diverse views, and have so recently and with such slight preponderancy of judicial suffrage, come to the conclusion that they have, we should not feel satisfied without being able to place our decision upon grounds satisfactory to ourselves, and resting upon what we consider sound principles of law.

In passing, however, it is apposite to call attention to the testimony of an authoritative witness as to the operation and effect of the recent decisions referred to. "The fruits of this rule," says Judge Davis, "are already being gathered in increasing accidents, through the decreasing care and vigilance on the part of these corporations; and they will continue to be reaped until a just sense of public policy shall lead to legislative restriction upon the power to make this kind of contracts."[*]

We now proceed to notice some cases decided in other States, in which a different view of the subject is taken.

In Pennsylvania, it is settled by a long course of decisions, that a common carrier cannot, by notice or special contract, limit his liability so as to exonerate him from responsibility for his own negligence or misfeasance, or that of his servants and agents.[†] "The doctrine is firmly settled," says Chief Justice Thompson, in *Farnham* v. *Camden and Amboy Railroad Company*,[‡] "that a common carrier cannot limit his liability so as to cover his own or his servants' negligence." This inability is affirmed both when the exemption stipu-

---

[*] Stinson *v* New York Central Railroad Co., 32 New York, 337.

[†] Laing *v.* Colder 8 Pennsylvania State, 479; Camden and Amboy Railroad Co. *v.* Baldauf, 16 Id. 67; Goldey *v.* Pennsylvania Railroad Co., 30 Id. 242; Powell *v.* Same, 32 Id. 414; Pennsylvania Railroad Co. *v.* Henderson, 51 Id. 315; Farnham *v.* Camden and Amboy Railroad Co., 55 Id. 53; Express Company *v.* Sands, Ib. 140; Empire Transportation Co. *v.* Wamsutta Oil Co., 63 Id. 14.

[‡] 55 Pennsylvania State, 62.

lated for is general, covering all risks, and where it specifically includes damages arising from the negligence of the carrier or his servants.   In *Pennsylvania Railroad Company* v. *Henderson*,[*] a drover's pass stipulated for immunity of the company in case of injury from negligence of its agents, or otherwise.   The court, Judge Read delivering the opinion, after a careful review of the Pennsylvania decisions, says: "This indorsement relieves the company from all liability for any cause whatever, for any loss or injury to the person or property, however it may have been occasioned; and our doctrine, settled by the above decisions, made upon grave deliberation, declares that such a release is no excuse for negligence."

The Ohio cases are very decided on this subject, and reject all attempts of the carrier to excuse his own negligence, or that of his servants.[†]   In *Davidson* v. *Graham*,[‡] the court, after conceding the right of the carrier to make special contracts to a certain extent, says: "He cannot, however, protect himself from losses occasioned by his own fault.   He exercises a public employment, and diligence and good faith in the discharge of his duties are essential to the public interests. . . . And public policy forbids that he should be relieved by special agreement from that degree of diligence and fidelity which the law has exacted in the discharge of his duties."   In *Welsh* v. *Pittsburg, Fort Wayne, and Chicago Railroad*,[§] the court says: "In this State, at least, railroad companies are rapidly becoming almost the exclusive carriers both of passengers and goods.   In consequence of the public character and agency which they have voluntarily assumed, the most important powers and privileges have been granted to them by the State."   From these facts, the court reasons that it is

---

[*] 51 Pennsylvania State, 315.

[†] Jones v. Voorhees, 10 Ohio, 145; Davidson v. Graham, 2 Ohio State, 131; Graham v. Davis, 4 Id. 362; Wilson v. Hamilton, Ib. 722; Welsh v. Pittsburg, Fort Wayne, and Chicago Railroad, 10 Id. 75; Cleveland Railroad v. Curran, 19 Id. 1; Cincinnati, &c., Railroad v. Pontius, Ib. 221; Knowlton v. Erie Railway Co., Ib. 260.

[‡] 2 Ohio State, 131.                    [§] 10 Id. 75, 76.

specially important that railroad companies should be held to the exercise of due diligence at least. And as to the distinction taken by some, that negligence of servants may be stipulated for, the court pertinently says: "This doctrine, when applied to a corporation which can only act through its agents and servants, would secure complete immunity for the neglect of every duty." And in relation to a drover's pass, substantially the same as that in the present case, the same court, in *Cleveland Railroad* v. *Curran*,\* held: 1st. That the holder was not a gratuitous passenger; 2dly. That the contract constituted no defence against the negligence of the company's servants, being against the policy of the law, and void. The court refers to the cases of *Bissell* v. *The New York Central Railroad*,† and of *Pennsylvania Railroad* v. *Henderson*,‡ and expresses its concurrence in the Pennsylvania decision. This was in December Term, 1869.

The Pennsylvania and Ohio decisions differ mainly in this, that the former give to a special contract (when the same is admissible) the effect of converting the common carrier into a special bailee for hire, whose duties are governed by his contract, and against whom, if negligence is charged, it must be proved by the party injured; whilst the latter hold that the character of the carrier is not changed by the contract, but that he is a common carrier still, with enlarged exemptions from responsibility, within which the burden of proof is on him to show that an injury occurs. The effect of this difference is to shift the burden of proof from one party to the other. It is unnecessary to adjudicate that point in this case, as the judge on the trial charged the jury, as requested by the defendants, that the burden of proof was on the plaintiff.

In Maine, whilst it is held that a common carrier may, by special contract, be exempted from responsibility for loss occasioned by natural causes, such as the weather, fire, heat, frost, &c.,§ yet in a case where it was stipulated that a rail-

---

\* 19 Ohio State, 1, 12, 13.       † 25 New York, **442**.
‡ 51 Pennsylvania State, 315.
§ Fillebrown *v.* Grand Trunk Railway Co., 55 Maine, 462.

road company should be exonerated from all damages that might happen to any horses or cattle that might be sent over the road, and that the owners should take the risk of all such damages, the court held that the company were not thereby excused from the consequences of their negligence, and that the distinction between negligence and gross negligence in such a case is not tenable. "The very great danger," says the court, "to be anticipated by permitting them" [common carriers] "to enter into contracts to be exempt from losses occasioned by misconduct or negligence, can scarcely be overestimated. It would remove the principal safeguard for the preservation of life and property in such conveyances."*

To the same purport it was held in Massachusetts in the late case of *School District* v. *Boston, &c., Railroad Company*,† where the defendant set up a special contract that certain iron castings were taken at the owner's risk of fracture or injury during the course of transportation, loading, and unloading, and the court say: "The special contract here set up is not alleged, and could not by law be permitted, to exempt the defendants from liability for injuries by their own negligence."

To the same purport, likewise, are many other decisions of the State courts, some of which are argued with great force and are worthy of attentive perusal, but, for want of room, can only be referred to here.‡

These views as to the impolicy of allowing stipulations against liability for negligence and misconduct are in ac-

---

* Sager v. Portsmouth, 31 Maine, 228, 238.

† 102 Massachusetts, 552, 556.

‡ Indianapolis Railroad v. Allen, 31 Indiana, 394; Michigan Southern Railroad v. Heaton, 31 Id. 397, note; Flinn v. Philadelphia, Wilmington, and Baltimore Railroad, 1 Houston, 472: Orndorff v. Adams Express Co., 3 Bush, 194; Swindler v. Hilliard & Brooks, 2 Richardson (So. Car.), 286; Berry v. Cooper, 28 Georgia, 543; Steele v. Townsend, 37 Alabama, 247; Southern Express Co. v. Crook, 44 Id. 468; Whitesides v. Thurlkill, 12 Smedes & Marshall, 599; Southern Express Co. v. Moon, 39 Mississippi, 822; New Orleans Mutual Insurance Co. v. Railroad Co., 20 Louisiana Annual, 302.

cordance with the early English authorities. St. Germain, in The Doctor and Student,\* pointedly says of the common carrier: "If he would per case refuse to carry it" [articles delivered for carriage] "unless promise were made unto him that he shall not be charged for no misdemeanor that should be in him, the promise were void, for it were against reason and against good manners, and so it is in all other cases like."

A century later this passage is quoted by Attorney-General Noy in his book of Maxims as unquestioned law.† And so the law undoubtedly stood in England until comparatively a very recent period. Serjeant Steven, in his Commentaries,‡ after stating that a common carrier's liability might, at common law, be varied by contract, adds that the law still held him responsible for negligence and misconduct.

The question arose in England principally upon public notices given by common carriers that they would not be responsible for valuable goods unless entered and paid for according to value. The courts held that this was a reasonable condition, and, if brought home to the owner, amounted to a special contract valid in law. But it was also held that it could not exonerate the carrier if a loss occurred by his actual misfeasance or gross negligence. Or, as Starkie says, "proof of a direct misfeasance or gross negligence is in effect an answer to proof of notice."§ But the term "gross negligence" was so vague and uncertain that it came to represent every instance of actual negligence of the carrier or his servant—or ordinary negligence in the accustomed mode of speaking.‖ Justice Story, in his work on bailments,¶ originally published in 1832, says that it is now held that, in cases of such notices, the carrier is liable for losses and injury occasioned not only by gross negligence, but by ordinary negligence; or, in other words, the carrier is bound to ordinary diligence.

---

\* Dialogue 2, c. 38.    † Noy's Maxims, 92.    ‡ Vol. 2, p. 135.
§ Evidence, vol. 2, p 205, 6th American edition.
‖ Hinton *v.* Dibbin, 2 Adolphus & Ellis, new series, 649; Wyld *v.* Pickford, 8 Meeson & Welsby, 4\^\.    ¶ Sec. 571.

In estimating the effect of these decisions it must be remembered that, in the cases covered by the notices referred to, the exemption claimed was entire, covering all cases of loss, negligence as well as others. They are, therefore, directly in point.

In 1863, in the great case of *Peek* v. *The North Staffordshire Railway Company*,* Mr. Justice Blackburn, in the course of a very clear and able review of the law on the subject, after quoting this passage from Justice Story's work, proceeds to say : " In my opinion, the weight of authority was, in 1832, in favor of this view of the law, but the cases decided in our courts between 1832 and 1854 established that this was not the law, and that a carrier might, by a special notice, make a contract limiting his responsibility even in the cases here mentioned, of gross negligence, misconduct, or fraud on the part of his servants; and, as it seems to me, the reason why the legislature intervened in the Railway and Canal Traffic Act, 1854, was because it thought that the companies took advantage of those decisions (in Story's language), ' to evade altogether the salutary policy of the common law.' "

This quotation is sufficient to show the state of the law in England at the time of the publication of Justice Story's work; and it proves that, at that time, common carriers could not stipulate for immunity for their own or their servants' negligence. But in the case of *Carr* v. *Lancashire Railroad Company*,† and other cases decided whilst the change of opinion alluded to by Justice Blackburn was going on (several of which related to the carriage of horses and cattle), it was held that carriers could stipulate for exemption from liability for even their own gross negligence. Hence the act of 1854 was passed, called the Railway and Canal Traffic Act, declaring that railway and canal companies should be liable for negligence of themselves or their servants, notwithstanding any notice or condition, unless the court or judge trying the cause should adjudge the conditions just and reasonable.‡ Upon this statute ensued a

* 10 House of Lords Cases, 473.          † 7 Exchequer, 707.

‡ 1 Fisher's Digest, 1466.

long list of cases deciding what conditions were or were not just and reasonable. The truth is, that this statute did little more than bring back the law to the original position in which it stood before the English courts took their departure from it. But as we shall have occasion to advert to this subject again, we pass it for the present.

It remains to see what has been held by this court on the subject now under consideration.

We have already referred to the leading case of *The New Jersey Steam Navigation Company* v. *Merchants' Bank.** On the precise point now under consideration, Justice Nelson said, "If it is competent at all for the carrier to stipulate for the gross negligence of himself and his servants or agents, in the transportation of goods, it should be required to be done, at least, in terms that would leave no doubt as to the meaning of the parties."

As to carriers of passengers, Mr. Justice Grier, in the case of *Philadelphia and Reading Railroad* v. *Derby*,† delivering the opinion of the court, said: "When carriers undertake to convey persons by the powerful but dangerous agency of steam, public policy and safety require that they be held to the greatest possible care and diligence. And whether the consideration for such transportation be pecuniary or otherwise, the personal safety of the passengers should not be left to the sport of chance, or the negligence of careless agents. Any negligence, in such cases, may well deserve the epithet of 'gross.'" That was the case of a free passenger, a stockholder of the company, taken over the road by the president to examine its condition; and it was contended in argument that, as to him, nothing but "gross negligence" would make the company liable. In the subsequent case of *The Steamboat New World* v. *King*,‡ which was also the case of a free passenger carried on a steamboat, and injured by the explosion of the boiler, Curtis, Justice, delivering the judgment, quoted the above proposition of Justice Grier, and said: "We desire to be understood to reaffirm that doctrine, as

---

* 6 Howard, 383.     † 14 Id. 486.     ‡ 16 Id. 469, 474.

resting not only on public policy, but on sound principles of law."

In *York Company* v. *Central Railroad*,[*] the court, after conceding that the responsibility imposed on the carrier of goods by the common law may be restricted and qualified by express stipulation, adds: " When such stipulation is made, and it does not cover losses from negligence or misconduct, we can perceive no just reason for refusing its recognition and enforcement." In the case of *Walker* v. *The Transportation Company*, decided at the same term,[†] it is true, the owner of a vessel destroyed by fire on the lakes, was held not to be responsible for the negligence of the officers and agents having charge of the vessel; but that was under the act of 1851, which the court held to apply to our great lakes as well as to the sea. And in *Express Company* v. *Kountze Brothers*,[‡] where the carriers were sued for the loss of gold-dust delivered to them on a bill of lading excluding liability for any loss or damage by fire, act of God, enemies of the government, or dangers incidental to a time of war, they were held liable for a robbery by a predatory band of armed men (one of the excepted risks), because they negligently and needlessly took a route which was exposed to such incursions. The judge, at the trial, charged the jury that although the contract was legally sufficient to restrict the liability of the defendants as common carriers, yet if they were guilty of actual negligence, they were responsible; and that they were chargeable with negligence unless they exercised the care and prudence of a prudent man in his own affairs. This was held by this court to be a correct statement of the law.

Some of the above citations are only expressions of opinion, it is true; but they are the expressions of judges whose opinions are entitled to much weight; and the last-cited case is a judgment upon the precise point. Taken in connection with the concurring decisions of State courts before cited, they seem to us decisive of the question, and

---

[*] 3 Wallace, 113.          [†] Ib. 150.          [‡] 8 Id. 342, 353.

leave but little to be added to the considerations which they suggest.

It is argued that a common carrier, by entering into a special contract with a party for carrying his goods or person on modified terms, drops his character and becomes an ordinary bailee for hire, and, therefore, may make any contract he pleases. That is, he may make any contract whatever, because he is an ordinary bailee; and he is an ordinary bailee because he has made the contract.

We are unable to see the soundness of this reasoning. It seems to us more accurate to say that common carriers are such by virtue of their occupation, not by virtue of the responsibilities under which they rest. Those responsibilities may vary in different countries, and at different times, without changing the character of the employment. The common law subjects the common carrier to insurance of the goods carried, except as against the act of God or public enemies. The civil law excepts, also, losses by means of *any* superior force, and any inevitable accident. Yet the employment is the same in both cases. And if by special agreement the carrier is exempted from still other responsibilities, it does not follow that his employment is changed, but only that his responsibilities are changed. The theory occasionally announced, that a special contract as to the terms and responsibilities of carriage changes the nature of the employment, is calculated to mislead. The responsibilities of a common carrier may be reduced to those of an ordinary bailee for hire, whilst the nature of his business renders him a common carrier still. Is there any good sense in holding that a railroad company, whose only business is to carry passengers and goods, and which was created and established for that purpose alone, is changed to a private carrier for hire by a mere contract with a customer, whereby the latter assumes the risk of inevitable accidents in the carriage of his goods. Suppose the contract relates to a single crate of glass or crockery, whilst at the same time the carrier receives from the same person twenty other parcels, respecting which no such contract is made. Is the company

a public carrier as to the twenty parcels and a private carrier as to the one?

On this point there are several authorities which support our view, some of which are noted in the margin.*

A common carrier may, undoubtedly, become a private carrier, or a bailee for hire, when, as a matter of accommodation or special engagement, he undertakes to carry something which it is not his business to carry. For example, if a carrier of produce, running a truck boat between New York City and Norfolk, should be requested to carry a keg of specie, or a load of expensive furniture, which he could justly refuse to take, such agreement might be made in reference to his taking and carrying the same as the parties chose to make, not involving any stipulation contrary to law or public policy. But when a carrier has a regularly established business for carrying all or certain articles, and especially if that carrier be a corporation created for the purpose of the carrying trade, and the carriage of the articles is embraced within the scope of its chartered powers, it is a common carrier, and a special contract about its responsibility does not divest it of the character.

But it is contended that though a carrier may not stipulate for his own negligence, there is no good reason why he should not be permitted to stipulate for immunity for the negligence of his servants, over whose actions, in his absence, he can exercise no control. If we advert for a moment to the fundamental principles on which the law of common carriers is founded, it will be seen that this objection is inadmissible. In regulating the public establishment of common carriers, the great object of the law was to secure the utmost care and diligence in the performance of their important duties—an object essential to the welfare of every civilized community. Hence the common-law rule which charged the common carrier as an insurer. Why charge him as such? Plainly for the purpose of raising the most

---

* Davidson *v.* Graham, 2 Ohio State, 131; Graham *v.* Davis & Co., 4 Id. 362; Swindler *v.* Hilliard, 2 Richardson, 286; Baker *v.* Brinson, 9 Id. 201; Steele *v.* Townsend, 37 Alabama, 247.

stringent motive for the exercise of carefulness and fidelity in his trust. In regard to passengers the highest degree of carefulness and diligence is expressly exacted. In the one case the securing of the most exact diligence and fidelity underlies the law, and is the reason for it; in the other it is directly and absolutely prescribed by the law. It is obvious, therefore, that if a carrier stipulate not to be bound to the exercise of care and diligence, but to be at liberty to indulge in the contrary, he seeks to put off the *essential duties* of his employment. And to assert that he may do so seems almost a contradiction in terms.

Now, to what avail does the law attach these essential duties to the employment of the common carrier, if they may be waived in respect to his agents and servants, especially where the carrier is an artificial being, incapable of acting except by agents and servants? It is carefulness and diligence in performing the service which the law demands, not an abstract carefulness and diligence in proprietors and stockholders who take no active part in the business. To admit such a distinction in the law of common carriers, as the business is now carried on, would be subversive of the very object of the law.

It is a favorite argument in the cases which favor the extension of the carrier's right to contract for exemption from liability, that men must be permitted to make their own agreements, and that it is no concern of the public on what terms an individual choses to have his goods carried. Thus, in *Dorr* v. *The New Jersey Steam Navigation Company*,* the court sums up its judgment thus: "To say the parties have not a right to make their own contract, and to limit the precise extent of their own respective risks and liabilities, in a matter no way affecting the public morals, or conflicting with the public interests, would, in my judgment, be an unwarrantable restriction upon trade and commerce, and a most palpable invasion of personal right."

Is it true that the public interest is not affected by indi-

---

* 1 Kernan, 485.

vidual contracts of the kind referred to? Is not the whole business community affected by holding such contracts valid? If held valid, the advantageous position of the companies exercising the business of common carriers is such that it places it in their power to change the law of common carriers in effect, by introducing new rules of obligation.

The carrier and his customer do not stand on a footing of equality. The latter is only one individual of a million. He cannot afford to higgle or stand out and seek redress in the courts. His business will not admit such a course. He prefers, rather, to accept any bill of lading, or sign any paper the carrier presents; often, indeed, without knowing what the one or the other contains. In most cases, he has no alternative but to do this, or abandon his business. In the present case, for example, the freight agent of the company testified that though they made forty or fifty contracts every week like that under consideration, and had carried on the business for years, no other arrangement than this was ever made with any drover. And the reason is obvious enough,— if they did not accept this, they must pay tariff rates. These rates were 70 cents a hundred pounds for carrying from Buffalo to Albany, and each horned animal was rated at 2000 pounds, making a charge of $14 for every animal carried, instead of the usual charge of $70 for a car-load; being a difference of three to one. Of course no drover could afford to pay such tariff rates. This fact is adverted to for the purpose of illustrating how completely in the power of the railroad companies parties are; and how necessary it is to stand firmly by those principles of law by which the public interests are protected.

If the customer had any real freedom of choice, if he had a reasonable and practicable alternative, and if the employment of the carrier were not a public one, charging him with the duty of accommodating the public in the line of his employment; then, if the customer chose to assume the risk of negligence, it could with more reason be said to be his private affair, and no concern of the public. But the condition of things is entirely different, and especially so

under the modified arrangements which the carrying trade has.assumed.. The business is mostly concentrated in a few powerful corporations, whose position in the body politic enables them to control it.   They do, in fact, control it, and impose such conditions upon travel and transportation as they see fit, which the public is compelled to accept.  These circumstances furnish an additional argument, if any were needed, to show that the conditions imposed by common carriers ought not to be adverse (to say the least) to the dictates of public policy and morality.   The status and relative position of the parties render any such conditions void.   Contracts of common carriers, like those of persons occupying a fiduciary character, giving them a position in which they can take undue advantage of the persons with whom they contract, must rest upon their fairness and reasonableness. It was for the reason that the limitations of liability first introduced by common carriers into their notices and bills of lading were just and reasonable, that the courts sustained them.   It was just and reasonable that they should not be responsible for losses happening by sheer accident, or dangers of navigation that no human skill or vigilance could guard against; it was just and reasonable that they should not be chargeable for money or other valuable articles liable to be stolen or damaged, unless apprised of their character or value; it was just and reasonable that they should not be responsible for articles liable to rapid decay, or for live animals liable to get unruly from fright and to injure themselves in that state, when such articles or live animals became injured without their fault or negligence.   And when any of these just and reasonable excuses were incorporated into notices or special contracts assented to by their customers, the law might well give effect to them without the violation of any important principle, although modifying the strict rules of responsibility imposed by the common law.   The improved state of society and the better administration of the laws, had diminished the opportunities of collusion and bad faith on the part of the carrier, and rendered less imperative the application of the iron rule, that he must be responsible at

all events.   Hence, the exemptions referred to were deemed, reasonable and proper to be allowed.   But the proposition to allow a public carrier to abandon altogether his obligations to the public, and to stipulate for exemptions that are unreasonable and improper, amounting to an abdication of the essential duties of his employment, would never have been entertained by the sages of the law.

. Hence, as before remarked, we regard the English statute called the Railway and Canal Traffic Act, passed in 1854, which declared void all notices and conditions made by common carriers except such as the judge, at the trial, or the courts should hold just and reasonable, as substantially a return to the rules of the common law.   It would have been more strictly so, perhaps, had the reasonableness of the contract been referred to the law instead of the individual judges.   The decisions made for more than half a century before the courts commenced the abnormal course which led to the necessity of that statute, giving effect to certain classes of exemptions stipulated for by the carrier, may be regarded as authorities on the question as to what exemptions are just and reasonable. . So the decisions of our own courts are entitled to like effect when not made under the fallacious notion that every special contract imposed by the common carrier on his customers must be carried into effect, for the simple reason that it was entered into, without regard to the character of the contract and the relative situation of the parties.

Conceding, therefore, that special contracts, made by common carriers with their customers, limiting their liability, are good and valid so far as they are just and reasonable; to the extent, for example, of excusing them for all losses happening by accident, without any negligence or fraud on their part; when they ask to go still further, and to be excused for negligence—an excuse so repugnant to the law of their foundation and to the public good—they have no longer any plea of justice or reason to support such a stipulation, but the contrary.   And then, the inequality of the parties, the compulsion under which the customer is placed, and the

obligations of the carrier to the public, operate with full force to divest the transaction of validity.

On this subject the remarks of Chief Justice Redfield, in his recent collection of American Railway Cases, seem to us eminently just. "It being clearly established, then," says he, "that common carriers have public duties which they are bound to discharge with impartiality, we must conclude that they cannot, either by notices or special contracts, release themselves from the performance of these public duties, even by the consent of those who employ them; for all extortion is done by the apparent consent of the victim. A public officer or servant, who has a monopoly in his department, has no just right to impose onerous and unreasonable conditions upon those who are compelled to employ him." And his conclusion is, that notwithstanding some exceptional decisions, the law of to-day stands substantially as follows: "1. That the exemption claimed by carriers must be reasonable and just, otherwise it will be regarded as extorted from the owners of the goods by duress of circumstances; and therefore not binding. 2. That every attempt of carriers, by general notices or special contract, to excuse themselves from responsibility for losses or damages resulting in any degree from their own want of care and faithfulness, is against that good faith which the law requires as the basis of all contracts or employments, and, therefore, based upon principles and a policy which the law will not uphold."

The defendants endeavor to make a distinction between gross and ordinary negligence, and insist that the judge ought to have charged that the contract was at least effective for excusing the latter.

We have already adverted to the tendency of judicial opinion adverse to the distinction between gross and ordinary negligence. Strictly speaking, these expressions are indicative rather of the degree of care and diligence which is due from a party and which he fails to perform, than of the amount of inattention, carelessness, or stupidity which he exhibits. If very little care is due from him, and he fails to bestow that little, it is called gross negligence. If very great

care is due, and he fails to come up to the mark required, it is called slight negligence. And if ordinary care is due, such as a prudent man would exercise in his own affairs, failure to bestow that amount of care is called ordinary negligence. In each case, the negligence, whatever epithet we give it, is failure to bestow the care and skill which the situation demands; and hence it is more strictly accurate perhaps to call it simply "negligence." And this seems to be the tendency of modern authorities.* If they mean more than this, and seek to abolish the distinction of degrees of care, skill, and diligence required in the performance of various duties and the fulfilment of various contracts, we think they go too far; since the requirement of different degrees of care in different situations is too firmly settled and fixed in the law to be ignored or changed. The compilers of the French Civil Code undertook to abolish these distinctions by enacting that "every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it."† Toullier, in his commentary on the code, regards this as a happy thought, and a return to the law of nature.‡ But such an iron rule is too regardless of the foundation principles of human duty, and must often operate with great severity and injustice.

In the case before us, the law, in the absence of special contract, fixes the degree of care and diligence due from the railroad company to the persons carried on its trains. A failure to exercise such care and diligence is negligence. It needs no epithet properly and legally to describe it. If it is against the policy of the law to allow stipulations which will relieve the company from the exercise of that care and diligence, or which, in other words, will excuse them for negli-

---

* 1 Smith's Leading Cases, 453, 7th American edition; Story on Bailments, § 571; Wyld v. Pickford, 8 Meeson & Welsby, 460; Hinton v. Dibbin, 2 Queen's Bench, 661; Wilson v. Brett, 11 Meeson & Welsby, 115; Beal v. South Devon Railway Co., 3 Hurlstone & Coltman, 337; Grill v. Iron Screw Collier Co., Law Reports, 1 Common Pleas, 600; Philadelphia & Reading Railroad Co. v. Derby, 14 Howard, 486; Steamboat New World et al. v. King, 16 Id. 474.

† Art. 1382.                              ‡ Vol. 6, p. 243.

gence in the performance of that duty, then the company remains liable for such negligence. The question whether the company was guilty of negligence in this case, which caused the injury sustained by the plaintiff, was fairly left to the jury. It was unnecessary to tell them whether, in the language of law writers, such negligence would be called gross or ordinary.

The conclusions to which we have come are—

*First.* That a common carrier cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law.

*Secondly.* That it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants.

*Thirdly.* That these rules apply both to carriers of goods and carriers of passengers for hire, and with special force to the latter.

*Fourthly.* That a drover travelling on a pass, such as was given in this case, for the purpose of taking care of his stock on the train, is a passenger for hire.

These conclusions decide the present case, and require a judgment of affirmance. We purposely abstain from expressing any opinion as to what would have been the result of our judgment had we considered the plaintiff a free passenger instead of a passenger for hire.

JUDGMENT AFFIRMED.