## GRISWOLD *VS.* N. Y. & N. E. RAILROAD COMPANY.

### *(Supreme Court of Connecticut.)*

### FREE PASS—LIMITATION OF LIABILITY.

A condition in a free pass issued by a railroad company, that the passenger will make no claim for damages for injuries caused by the negligence of the railroad's servants, is a reasonable one, and will prevent a recovery of such damages, even though the passenger was a minor and the injuries were caused by gross negligence on the part of the railroad employes.

The plaintiff was employed by the keeper of a restaurant at a railroad station to sell sandwiches on the train. While so employed he applied for and obtained a free pass, which, at the time of the accident, he was using to make a journey for his own pleasure, and not for the purposes of his business. *Held*, that the pass could not be considered as issued for a consideration, so as to give plaintiff the right of a passenger for hire.

W. C. Case and P. E. Bryant, for plaintiff.

S. E. Baldwin and E. D. Robbins, for defendant.

Loomis J.—The plaintiff's intestate, Charles P. Griswold, was a boy about seventeen, employed by the keeper of a restaurant at the defendant's station in Waterbury to sell sandwiches, fruits, etc., on all trains coming into Waterbury, having a free pass for that purpose between Hartford and Fishkill. His employment did not require him to travel as far east as Plainville, but his mother lived there, and he often went there to visit her. In July, 1883, he was at Plainville for this purpose, and boarded a train bound thence for Hartford, in order to stop off at Clayton and look at the wreck of a train there caused by a collision the day before. The train had two passenger cars, and the conductor saw him on one of them just after the train started, but afterwards, without the conductor's knowledge, he went into the baggage car, and while there a collision occurred with another train coming westerly (there being but a single track), which wrecked the engine and baggage car and killed the intestate. He was at the time riding on a free pass, which provided that the person accepting it assumed all risk of accident, and expressly stipulated that the company should not be liable, under any circumstances, whether of negligence of their agents or otherwise, for any personal injury.

The defense was placed on three independent grounds:

1. The complaint was demurred to upon the ground that the action was brought for the sole benefit of the estate of the intestate, when it should have been for the benefit of the widow or heirs;

2. That the intestate was guilty of such contributory negligence as would prevent recovery; and,

3. That at the time of the injury he was traveling on the defendant's train without the payment of any fare, under an agreement or condition expressly assuming all risk of accident, and stipulating that the defendant should not be liable in any event for injuries resulting from the negligence, etc., of its servants, or otherwise.

As our views of the last question will be decisive of the whole case, we will confine our discussion to that, and waive the other two questions.

Before we come to the discussion of the question whether, under the conditions of the pass, the law will protect the defendant from liability, it will be necessary to determine whether the pass was gratuitous, or upon considerations, for if the latter is true, the defendant must be held to its full responsibility as a carrier of passengers. The plaintiff contends that the pass was a part of the consideration to induce Chickering to open a lunch room in the defendant's station at Waterbury, but the finding is silent in regard to this, and we are not justified in assuming that it was an element in the negotiations, or was in the mind of either party. It was, on the other hand, obviously an afterthought, and when asked for by Chickering he did not refer to it as a thing promised by Holbrook or any one on behalf of the company. It was not claimed as matter of right under any contract duty, but merely as matter of favor, and as such we must hold it to have been granted.

The question of consideration should be determined, as in any other case of contract. The existence of some selfish motive, if any, impelling the act, renders it none the less a gratuity in the eye of the law, if there was no obligation at all to furnish the pass. The restaurant business belonged exclusively to Chickering, whatever may have been the incidental benefits to the railroad company.

And besides, it is to be observed that at the time of the injury the intestate was not traveling at all in the interest of the restaurant, but solely to gratify a personal curiosity, which could by no possibility be any benefit, direct or indirect, to the railroad company; so that, on the whole, we have no hesitation in calling his pass a pure gratuity. We have, then, a case where the defendant gave a free pass upon the express condition that the passenger would make no claim for damages on account of any personal injury received while using the pass in consequence of the negligence of the defendant's servants. But the plaintiff, as the personal representative of the one receiving the pass, has instituted a suit in direct violation of condition.

In ordinary transactions, such a breach of good faith, to say nothing of the breach of contract, would be disgraceful, but there may be great considerations of public policy which will conceal the private features of the transaction, and make the stipulation invalid in the eye of the law.

By the English decisions, it is clear that the carrier has full power to provide by contract against all liability for negligence in such cases. (McCowley *vs.* The Furness Rly. Co., L. R., 8 Q. B. 57; Hall *vs.* N. E. Rly. Co., Id. 437; Duff *vs.* The Great N. Rly. Co., L. R., 4 Irish Common Law, 178; Alexander *vs.* Toronto & Nepessing Rld. Co , 33 Upper Canada, 474). This last case is almost identical with the one at bar.

In the United States we find much contrariety of opinion. Some state courts of the highest authority follow the English decisions, and allow railroad companies in consideration of free passage to contract for exemption from all liability for negligence of every degree, provided the exemption is clearly and explicitly stated. (Wells *vs.* N. Y. Cent. Rld., 27 Barb. 641, and same case 24 N. Y. 181; Perkins *vs.* Rld., Id. 208; Bissell *vs.* N. Y. Cent. Rld., 25 Id. 442; Poucher *vs.* N. Y. Cent. Rld., 49 Id. 263; Maguin *vs.* Dinsmore, 56 Id. 168; Dorr *vs* N. J. Steam Nav. Co., 1 Kernan, 486; Kinney *vs.* Cent. Rld., 32 N. J. L. 409, and 34 Id. 513; Western & Atlantic Rld. *vs.* Bishop, 50 Ga. 465).

Other courts also of high authority concede the right to make such exemption in all cases of ordinary negligence, but refuse to apply the principle to cases of gross negligence. (Ill. Cent. Rld. Co. *vs.* Reed, 37 Ill. 484; Ind. Cent. Rld. *vs.* Mundy, 21 Ind. 48; Jacobus *vs.* St. Paul and Chicago Rld , 20 Minn. 125).

And other state courts of equal authority utterly deny the power to make a valid contract exempting the carrier from liability for any degree of negligence. (Rld. *vs.* Curran, 19 Ohio St. 1; Mobile & Ohio Rld. *vs.* Hopkins, 41 Ala. 486; Penn. Rld. Co. *vs.* Henderson, 51 Penn. St. 315; Flinn *vs.* Wilmington, &c., Rld. Co., 1 Houst. [Del.] 469).

The supreme court of the United States, in Rld. Co. *vs.* Lockwood, 17 Wall. 357, where a driver had a free pass to accompany his cattle on their transportation, *held*, in opposition to the New York and English cases, that the pass was not gratuitous, because given as one of the terms for carrying the cattle, for which he paid. The reasoning of Bradley, J. was directed so strongly to the disparagement of the New York decisions, that it might have indicated an opposition to the principle of those cases in other respects, had not the opinion concluded with this distinct disclaimer : "We purposely abstain from expressing any opinion as to what would have been the result of our judgment had we considered the plaintiff a free passenger instead of a passenger for hire." The reasoning and the conclusions of the court, therefore, must be considered as all based on the assumption that the passenger paid for his passage.

The conclusions of the court were :

"1. That a common carrier cannot lawfully stipulate for exemption from responsibility, when such exemption is not just and reasonable in the eye of the law.

"2. That it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for negligence of himself or his servants."

We are not disposed to attempt to controvert the soundness of these propositions as applicable to passengers for hire, but it remains an open question, What is reasonable in case of a free passenger? Will a just sense of public policy allow any distinction? It seems to us the two cases cannot be identical in the eye of the law or of public policy, but that there is ample ground for a distinction.

In the first place, the arrangement between the parties ought not to be regarded as a contract with the railroad company in its character as a common carrier, and therefore the stipulated exemption is no abdication of that rigid responsibility which the law imposes on common carriers.

The gratuitous accommodation concerns only the immediate parties, unless in a very indirect way, by making the fare of other passengers higher. If, however, fares are unreasonable, they may be subject to governmental regulation. But it will suffice to say that the remote and indirect effect alluded to cannot make the exemption void on the ground of public policy. Many other gratuities and charities might be named, which, though conceded to be commendable, would have a similar effect.

Again, in Rld. Co. *vs.* Lockwood, *supra*, and in other cases advocating the same doctrine, one prominent reason given for holding the contract void as opposed to public policy is, that in making the contract the carrier and his customer do not stand on a footing of equality; that the latter is only one individual against a powerful corporation, which has him in its power, and that he cannot afford to higgle in regard to terms. It is manifest that this reasoning has no application at all to a free passenger.

If his position is not superior, it is at least equal, to that of the railroad company. The latter will not often be found urging the acceptance of free passes. There is no possibility of any "higgling" on the part of the passenger for more favorable terms, and the solicitation for the pass itself will come from the latter also. Under these circumstances it does not seem reasonable to add to a free gift of transportation the burden of insuring the passenger against all personal injuries arising from the negligence of the carrier's servants, the risk being well known and willingly assumed by the passenger, as the condition upon which the gift is made.

But it may be suggested that there is involved in negligence, especially where the safety of life is concerned, a moral as well as legal culpability which renders such contract of exemption void as against

public policy. But those who regard this argument as decisive must, it seems to us, overlook the fact that there may be, and very often is, negligence that would be called gross on the part of servants, for which there is no moral culpability at all on the part of the master. The parties contracting for the exemption under consideration well know that railroad passengers continually exposed to risks arising from some momentary lapse of memory or attention on the part of servants who have gained a high reputation for skill, prudence and carefulness, and who were, it may be, selected on that account. A large percentage of accidents will be found to have resulted in the way suggested, without any actual fault on the part of the officers of the corporation. Now, the finding in the case at bar is explicit, that the injury to the plaintiff's intestate resulted from the gross negligence of the defendant's servants. This restriction is exclusive, and is to be understood as used in contradistinction to negligence on the part of the corporation itself through the acts of those who properly represent it.

By the rule of *respondeat superior*, a corporation is made liable for the negligence of its servants; but where the principal has done the best he could, the rule is technical, harsh, and without any basis of inherent justice. As applicable ordinarily to corporations, it is of great practical convenience and utility. We do not, therefore, advocate its abolition, but we contend that in a case like the present, where there is no actual blame on the part of the principal, it is reasonable, in the eye of the law, that the party for whose benefit the rule is given should be allowed to waive it in consideration of a free passage. It is not the case where a party stipulates for exemption from the legal consequences of his own negligence, but one where he merely stipulates against a liability or imputed negligence, in regard to which there is no actual fault.

It is easy to see, therefore, that considerations of public policy have no application to such a case.

Where a master uses due diligence in the selection of competent servants, and furnishes them with suitable means and machinery to perform the service in which he employs them, he is not answerable to one of them for an injury received in consequence of the negligence of another fellow servant while both are engaged in the same service. Here, the rule of *respondeat superior* is waived, and it is generally put on the ground of implied contract. And if a waiver may be implied in such case, why not give an effect to an express agreement in the case of a free passenger?

The Roman law, with its clear sense of justice, made a distinction similar to the one for which we contend, in determining the liability of the mandatory for the negligence of his agents. Where the business of

the mandatory required the interposition of sub-agents, he was liable for the negligence of such sub-agents only on the ground of *culpa in eligendo*, supposing he knew or could have known their inadequacy.

The foregoing reasoning, as it seems to us, will also furnish a complete answer to a claim that the defendant must be held liable on account of the gross negligence of its servants, for it is manifest that the principal is no more culpable in one case than in the other; and the rule of *respondeat superior* being waived, the protection is complete.

The word "negligence," in the stipulation for exemption, is used in its generic sense, and comprehends all degrees.

And we may add that some high modern authorities have expressed strong disapprobation of any attempt to fix the degrees of diligence or negligence, because the distinction is too artificial and vague for clear definition or practical application. (See the opinion of a court in Rld. Co. *vs.* Lockwood, 17 Wall. 382, and cases referred to in a note on p. 383).

The only remaining question to be considered is, Whether the minority of the plaintiff's intestate, which rendered him incapable generally of making contracts, will render his assent to the limitation or condition of the pass void also?

But a minor has capacity in law to accept free gift, either absolute or conditional. If the condition or limitation is reasonable, he cannot accept the gift and reject the condition or limitation; for that would enlarge the gift, which, of course, cannot be done without the consent of the donor.

If the intestate did not like the gift as made, he should have declined to accept it, and not attempt (as his personal representative is doing) to make it include in effect, contrary to its terms, an insurance against risks arising from the negligence of the defendant's servants.

There was error in the judgment complained of, and it is reversed and the case remanded.—*Kansas Law Journal.*

---

## QUEER LAW SUIT—BEES *VS.* SHEEP.

A novel suit has just been terminated in the Richland county (Wis.) circuit court, by the dismissal of the complaint at the hands of his honor, Judge William Clementson. The plaintiff, J. H. Powers, of Ithica, that state, is the owner of a large sheep ranch in Richland county, adjoining the land of the defendant, Freeborn, a prominent bee-keeper. The suit was for $1,000 damages, the complainant alleging that many of his sheep had died, and that the "poor, weak and feeble condition of the remainder of the flock" was due entirely to the swarms of defendant's bees, which invaded his (plaintiff's) land and drove his