## THE IRA B. ELLEMS.

### OTIS MANUF'G CO. v. THE IRA B. ELLEMS.

(*Circuit Court of Appeals, Fifth Circuit.* June 6, 1892.)

#### No. 21.

1. **SHIPPING—LOSS OF CARGO—STIPULATION AGAINST MASTER'S NEGLIGENCE.**
   Where a vessel is chartered for a cargo of logs, a provision that the cargo is "to be delivered alongside, and held at charterer's risk and expense," is not unreasonable in itself, or invalid as exempting the master from liability for his own negligence; and where a raft of logs was brought alongside at 6 in the evening, and moored by the charterer's agent and employes, the master was bound only to exercise ordinary care to see that it was not carried away during the night. 48 Fed. Rep. 591, affirmed.

2. **SAME—LEAVING PORT BEFORE FULL CARGO FURNISHED—MISCONDUCT OF CHARTERER'S AGENT.**
   The logs having been carried away during the night, the charterer's agent claimed that the master was responsible, said he would furnish no more cargo, and left the ship, threatening to institute legal proceedings. *Held* sufficient to justify the master in considering that he had all the cargo that would be furnished, and in proceeding upon the voyage.

3. **SAME—THREAT OF LEGAL PROCEEDINGS IN FOREIGN PORT.**
   The vessel being an American vessel, and the charter party having been signed upon the high seas, the customs officers of a foreign port did not constitute the proper forum in which to claim redress, and the threat to institute legal proceedings was of itself sufficient to justify the master in leaving.

4. **CHARTER PARTY—CONSTRUCTION—"SHORTAGE."**
   A charter party for a cargo of timber provided that the charterer was to pay "at the rate of $6.25 per ton of 40 cubic feet, actual contents delivered. In case of shortage she receives on all short of 400 tons, down to 350 tons, $3.12½, and for all

less than 350 tons, full rates." *Held*, that the full cargo stipulated for is 400 tons, and the word "shortage" refers to a failure to furnish this amount.

48 Fed. Rep. 591, affirmed.

Appeal from the Circuit Court of the United States for the Eastern District of Louisiana.

In Admiralty. Libel by the Otis Manufacturing Company against the schooner Ira B. Ellems to require the delivery of cargo. Cross libel by the claimants of the schooner for freight, demurrage, and damages. Decree for claimants. Libelant appeals. Affirmed.

Statement by LOCKE, District Judge:

The libelant in the court below, the appellant here, by its agent, chartered on the 24th of April, 1890, the schooner Ira B. Ellems, then lying at Coatzocoalcos, Mexico, to proceed to Frontera, thence to Tupilco, to load with mahogany and cedar for New Orleans. The charter party provided that—

"The said party of the second part doth engage to provide and furnish to the said vessel a full and complete cargo of mahogany and cedar logs, under and on deck; cargo to be delivered alongside, and held at charterer's risk and expense, and stevedores' charges loading guarantied not to exceed $1 per ton, Mexican; and to pay to the party of the first part, or agent, after true and faithful delivery of cargo, for the use of said vessel during the voyage aforesaid, at the rate of ($6.25) six dollars and twenty-five cents, American currency, per ton of 40 cubic feet, actual contents delivered. In case of a shortage, she receives on all short of 400 tons, down to 350 tons, ($3.12½) three dollars and twelve and one half cents, American, and for all less than 350 tons, full rates. Charterer will advance necessary money for disbursements, same to be deducted from freight, including cost of insurance and interest. * * * It is also agreed that this charter shall commence and lay days for loading shall be allowed as follows: Commencing from the time the captain reports the vessel to charterer or agent, in writing, as being ready to receive cargo, twenty (20) running days, (Sundays only excepted, in case stevedores refuse to work,) including time taken in changing ports in case it should be necessary, and for discharging quick dispatch. And in case vessel be longer detained, for each and every day's detention by default of said party of the second part, or agent, thirty American silver dollars demurrage per day, day by day, shall be paid by said party of the second part, or agent, to said party of the first part, or agent. Charterer guaranties stevedore not to exceed sixty (60) cents on discharging in New Orleans, and vessel pays no wharfage. The danger of the seas, fire, and navigation of every nature and kind, always mutually excepted."

After the execution of the charter party the vessel proceeded to Frontera, entered and cleared for New Orleans via Tupilco, and went there to load, arriving and reporting to Mr. Scheidell, charterer's agent, as ready for cargo, at 6 in the morning of May 4, 1890. From that time cargo was received as it came off in rafts from time to time, until the 3d of June, when Mr. Scheidell came off to the vessel, as she was lying from one and one-half to two miles off shore in the open roadstead, and said he had one more raft of logs, which he was going to give them that night. Late that afternoon the raft was brought off, arriving there about 6 o'clock, and was made fast astern of the schooner by Mr. Scheidell and the men from the shore employed with him. Both Far-

well, the master, and Murray, the mate, of the schooner, called his attention to the rope and chain, and the way the raft was made fast, but he said it "was good enough;" that it was all right. That night all of the logs but two broke away and went adrift. Learning this upon coming off the next morning, Mr. Scheidell insisted that the master of the schooner was responsible, and must settle for them. This the master did not admit, when Scheidell threatened to report him to the judge, and have him summoned to court, at the same time declaring that he was "liable for $1,000 fine, and that the charter party was no good, because it had no stamps on it." The evidence is that he said that he had no more cargo for the vessel, and refused to accept bills of lading, or make any further settlement, but went ashore. The schooner remained there during the day until about 5 P. M., then left for New Orleans, where she arrived June 16th. Upon his arrival the master demanded payment for 12 days' demurrage, which he claimed was due him for detention, which was paid, and then demanded a payment or deposit of the freight, amounting to $2,350, before delivering the cargo; whereupon the charterer filed his libel, alleging that the schooner had departed from the port of loading without taking on board a full cargo, contrary to the terms of the charter party, and refused to deliver the cargo then on board. Upon exceptions an amended libel was subsequently filed, alleging that the schooner took into its possession a raft of logs necessary to complete its lading, and by direction of its officers, contrary to the charter, and at its own risk declined to take the same on board, and so placed and located them that in consequence the logs went adrift and were lost, and praying that the schooner be attached for nondelivery of cargo, and the cargo be discharged and delivered to libelant. This was done, upon the company's giving a bond in the sum of $2,600, when the owners of the schooner filed their claim and cross libel, setting up the terms of the charter party, and alleging that the raft of logs, the loss of which had been complained of, was at the risk of the charterer, and lost by fault of its agent; that the schooner had received all the cargo that was furnished and provided by the charterer's agent, and left only after he had refused to furnish any more; and praying payment for the entire freight earned, and demurrage and damages. Upon these pleadings the case was heard, the cross libel sustained, and judgment given for claimants.

*W. S. Benedict*, for libelant.

*O. B. Sansum*, for appellees.

Before McCORMICK, Circuit Judge, and LOCKE and BRUCE, District Judges.

LOCKE, District Judge, *(after stating the facts.)* The libelant in this case has so persistently prosecuted its appeals, this being the third hearing and decree herein, that it would appear that it must have an honest faith in the integrity and justice of its position, so that we shall express our opinions and the reasons for them more at length than the circumstances of the case would otherwise seem to demand.

The first question in this case. and the one upon which all others depend, is, at whose risk was the raft of logs which was lost? Who must be held responsible for it, and upon whom must the loss fall? A common carrier's or shipowner's right and power to determine by contract his responsibilities in the care, custody, and control of cargo have always been admitted, and such contract sustained, when its provisions, by which such limitation is expressed, are reasonable in themselves, and do not undertake to excuse the carrier for his own negligence. *New Jersey Steam Nav. Co.* v. *Merchants' Bank*, 6 How. 344; *Railroad Co.* v. *Lockwood*, 17 Wall. 357; *York Co.* v. *Illinois Cent. R. R.*, 3 Wall. 107. The language of the contract usually determines the conditions and time under which the responsibility of the shipowner is assumed in receiving cargo, and the termination of his risks in discharging. In receiving cargoes by lighter or by raft it is usually declared whether the cargo is to be at the shipper's or shipowner's risk, while alongside. In this case the language would appear to be plain and distinct, and to determine the risk of the cargo while waiting to be taken on board. Was the agreement, "cargo to be delivered alongside, and held at charterer's risk and expense," unreasonable in itself, or, under the circumstances, could it be claimed to protect the master from the result of his own negligence? Had the master insisted that it should be held alongside an unreasonable length of time, or had he declined to take it on board at the earliest reasonable moment, or in any way attempted to shield himself from the results of his own negligence in connection with the property, such fact might be considered in its effect, and such agreement disregarded; but neither of these conditions seems to be the case here. The vessel was but temporarily there. The shipper had permanent business relations, and men presumed to be constantly in his employ; and rafts or logs, if going adrift and driven ashore, or afloat in the vicinity, could more easily and surely be recovered by one party than by the other. The charterer appears to have had on board the vessel as many men in his employ, or employed by his selection and procurement, by whom he could have watched or cared for any cargo alongside, as comprised the crew of the vessel. So the terms of the charter party would not in themselves, as generally applied, seem to be unreasonable. In this particular case the raft did not reach the vessel until about 6 o'clock in the afternoon. It could not be reasonably asked or expected that the logs should be taken on board that night, and, unless it would be protecting the master against the results of his own negligence, they would be at the risk of the shipper. Upon this point the evidence is that the raft was held and treated by shipper's agent as at the risk of his principal. The evidence shows that it was taken alongside and dropped astern by the raftsmen under Scheidell's superintendence; that there was nothing at all in any remark or suggestion of Farwell, the master, or Murray, the mate, in connection with making it fast, that could be construed into assuming the responsibility or care of it, or changing the risk. The circumstances did not seem to demand that ordinary care and diligence would require a watchman. It had been made fast under the personal superintendence of

Scheidell, who declared it was all right, and "good enough." No watchman had been suggested by him. The night was smooth and calm, and there was no increase of wind or change in the condition of things that would seem to demand any greater care on the part of the master.

We do not see any possible construction by which the schooner should be held responsible for the loss of these logs, and upon that point the case turns. It is immaterial, in the determination of this case, whether or not there was any more cargo belonging to libelant there. Scheidell, its agent, to whom the master was directed by the charter party to look for cargo, refused to furnish any more, and informed him definitely and positively that he had no more for him, and left with the threat to have him summoned to court. We consider that the master was justified in considering that he had all the cargo that would be furnished, and that his load was completed, and he had a right to proceed on his voyage. There is no allegation in the pleadings, nor the slightest testimony in the evidence, that Scheidell furnished or offered to furnish, or suggested the probability or possibility of his being able to furnish, more cargo for the schooner; and if it is true, as claimed, that there was more cargo there that could have been furnished, it makes his course more inexcusable, and his conduct more culpable. The leaving of any papers at Tupilco, if any were so left, is entirely immaterial in this case. If the schooner laid herself liable to a fine for leaving without papers or a clearance, under the Mexican law, which does not appear, it has in no way affected the interests of the libelant.

Reviewing the assignment of errors, we do not find that the testimony establishes the violation of the charter party by the master in refusing to receive more cargo. We find no evidence at all showing that he at any time refused to receive cargo, but that everything shows that he was willing to receive it, until informed that libelant's agent had no more for him. In the matter of not caring for cargo moored alongside, we have already considered, and find that he was under no legal obligation to use more than ordinary care in looking out for it, and in not permitting it to go adrift willfully and knowingly, and of this there is no evidence. In the matter of negligence or malice in breaking the dogs in cargo, and permitting same to go adrift, and become a total loss, we fail to find a *scintilla* of evidence supporting any such charge. In the matter of refusing to give or grant proper bills of lading for cargo then on hand, the only evidence, instead of showing that the master refused to give bills of lading, shows conclusively that he repeatedly offered to Scheidell to give him bills of lading for all the cargo received, which Scheidell positively refused to accept. In the charge of departing with his vessel to prevent redress of charterer's agent through the proper customs officers of the port, we can in no way accept libelant's view that the customs officers of a foreign port constitute the proper forum by which the agent of a citizen of the United States might seek redress of an American vessel for noncompliance with the terms of a charter party signed on the high seas, and consider the master fully justified in leaving with his vessel to avoid the seeking of such redress as was threatened. It is also

charged that he was not justified in demanding freight money on cargo unknown. Ordinarily it would be considered unusual to demand payment of freight before the entire or partial discharge of a cargo, and before any opportunity had been had to inspect, measure, or determine it; but in this case there had been a controversy, and it was plainly seen that there was to be a conflict of opinion and a continued demand for the loss of the cargo, the same as had been made by the agent at the place of loading. The vessel was lying at the charterer's wharf and mill, and a discharge would be into the custody, control, and possession of the charterer, which might reasonably raise the question of an abandonment of the freighter's lien, and we consider the master, under the circumstances, was fully justified in the demand for a deposit of freight money. The charterers have suffered nothing from such demand, as no payment or deposit has been made.

The so-called "official records" of protest from the port of departure have been examined, and found to contain nothing that would in the least affect the conclusions reached upon the question of fact, even were they admitted as evidence.

Assignment of errors No. 3 claims that the decree does not allow the deductions from freight money found due, of the expenses paid by the charterer, and not denied under the charter stipulations.

It has been claimed in exhibits filed that these bills of towage, custom house, stevedores', and quarantine expenses had been paid by the libelants, but we have searched in vain for any proof of payment of any such amounts as claimed. The allegations of the payment of such expenses to the amount of $1,074 was charged in the fourth article of the amended libel, and positively denied in claimant's answer. In Exhibit A put in, but in no way sworn to or made evidence, there appears an item of "Port charges of vessel, paid, $1,074." The only evidence we find touching this subject in the record is in the testimony of Mr. Henry Otis:

"*Question.* There is an item here of $1,074 in this Exhibit A. What is that for? *Answer.* Well, I cannot tell you entirely. We have the bills, and we will put them in detail," (and the witness states that he will send them in.)

This is the only testimony that can be found relating to the payment of any of these items. Certain papers purporting to be bills appear copied into the record, but they are entirely unsupported by oath, and can have no validity as evidence. Libelants were under no obligation to pay any of these bills. The agreement of the charter party that charterer would advance necessary funds for disbursement of vessel could only have reference to the disbursements at the port of loading, where it was to be presumed the vessel would be without funds; and nothing but positive evidence of payment would justify the allowance of them, and this we do not find.

There was no allegation in the libel to that effect; but one claim which was put in by libelant, in the nature of damages, was for injury to saws, done in sawing the cargo, on account of a large number of iron rafting dogs found broken off in the logs which were claimed to

have been maliciously broken by the master of the schooner. The only evidence touching this charge of $500, further than that the broken dogs were found, and the saws damaged, is the statement of Harry A. Otis, who states that he was on board the schooner when she reported for cargo; that he remained on board "about a week or five days;" and "the captain broke most of the dogs getting the logs aboard, or rather when he had them aboard." The testimony of the master and the log book show that the first raft did not come off until after the vessel had been waiting nine days, thus contradicting the testimony that any logs came on board while he was there. Unquestionably the dogs were found in the logs when they came to be sawed, but how they came to remain there is not shown, whether from some former rafting,—as it appears that these were refuse logs, and had been lying waiting a market for several years,—or whether they were broken necessarily, accidentally, or carelessly, or in some other manner. Neither the master nor crew had anything to do with putting the dogs into the logs, and we do not think the evidence is sufficient to find that the master of the schooner willfully, or even negligently, so broke them off as to do the damage charged.

As to the amount of freight due under the charter party, its terms upon which freight must be determined are:

"The party of the second part is to pay to said party of the first part or agent, after true and faithful delivery of the cargo, for the use of said vessel during the voyage aforesaid, at the rate of six dollars and twenty-five cents, American currency, per ton of forty cubic feet, actual contents delivered. In case of a shortage, she receives on all short of 400 tons, down to 350 tons, three and twelve and a half hundredths dollars, (American,) and for all less than 350 tons full rates."

The term "shortage," used in charter party, may be used, and is intended to apply to either short loading or short delivery. In the latter the ship pays a stipulated sum for the amount of cargo received and not delivered; in the former, where the charterer has stipulated for a full cargo, and any agreement is made as to what a full cargo is, the charterer pays and the ship receives, as stipulated damages for noncompliance with the terms of the charter party in not furnishing a full cargo, the amount agreed upon, stipulated for, or proven in evidence. The sentences in this charter party relating to the amount of freight must be read together. The provision relating to shortage must be read in connection with the preceding sentence, and so far modify it as it is applicable. It can only apply to shortage of loading or furnishing cargo as the schooner receives the stipulated sum; and the full cargo, as stipulated for, is declared to be 400 tons. The charter party was practically for a lump sum up to freight for 400 tons, with additional if any more was actually carried, and, in the absence of fault of the owner, was not to be less than $6.25 per ton for 350 tons, and $3.12½ for 50 tons. We find no default or noncompliance with the terms of the charter by the master of the schooner, the agent of claimants; and the amount of freight, as determined by that contract, $2,343.75, less the stevedores' bill, of Tupilco, must be considered as due, and the judgment of the court below must be affirmed, with costs.