Wanamaker, J.
On July 8, 1912, Mary Kinney, a woman 42 years of age, entered the employment of the Pullman Company as a car cleaner at a wage of $1.25 per day.
On the 16th day of October, 1912, in the course of her employment, she was seriously injured by a movement of one of the trains of The Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company. Thereupon Mary Kinney brought suit against the railway company,’in the court of common pleas, for damages by reason of said injuries, averring in her petition in substance that on said 16th day of October, 1912, she was on one of the Pullman Company’s cars known as the “Montgomery,” and that while about to alight from the car the railway company, without any warning or *66 notice, and without giving her time and opportunity to alight therefrom, carelessly and negligently started the car with force and violence and with a jerk; whereby plaintiff was theft and there thrown to the ground and permanently and severely injured.
The defendant railway company answered, setting up the defenses of a general denial, contributory negligence and exclusive negligence of the plaintiff; and for a special defense, known as Number 4, pleaded that Mary Kinney at the time of her injuries had entered into a contract with the Pullman Company wherein it was agreed that she, the said Mary Kinney, in consideration of employment and wages therefor by the Pullman Company, would assume all risks of accident or casualty incident to such employment and service, and would forever release, acquit and discharge said Pullman Company from all liability therefor.
The railway company further answered, averring the fact to be that the Pullman Company had promised and agreed to protect the defendant railway company and hold it harmless from all and any liability it might be under to employes of the said Pullman Company, or for any injuries sustained by them while so cleaning said sleeping cars, whether injuries were caused by negligence of the defendant railway company or its employes, or otherwise.
The defendant railway company further pleaded that the said agreement between Mary Kinney and the Pullman Company recited the fact of the agreement between said Pullman Company and the rail *67 way company, and that she, the said Mary Kinney, had ratified' the contract between - said Pullman Company and the defendant railway company, and did agree to protect, indemnify and hold harmless the said Pullman Company in respect to any and all sums of money it might be compelled to pay in consequence of any injury or death happening to her, and that she did agree that said agreement between her and said Pullman Company might be assigned to the defendant railway company, or any other corporation, and used in its defense.
Upon trial had in the court of common pleas Mary Kinney recovered a judgment for $4,000. This judgment was affirmed by the court of appeals. Error is here prosecuted to reverse that judgment.
The one big question in this case for the consideration of this court grows out of the fourth defense, to which the plaintiff demurred, which demurrer was sustained by the trial court and exceptions taken. The question here is as to the sufficiency of that defense.
The ground upon which the demurrer was sustained was that that part of the contract between Mary Kinney and the Pullman Company, pleaded as a fourth defense by the defendant railway company, was null and void upon the ground that the same was contrary to public policy.
What is the meaning of “public policy?” A correct definition, at once concise and comprehensive, of the words “public policy” has not yet been formulated by our courts. Indeed the term is as difficult to define with accuracy as the word “fraud” *68 or the term “public welfare.” In substance it may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare and the like. It is that general and well-settled public opinion relating to man’s plain, palpable duty to his fellowmen, having due regard to all the circumstances of each particular relation and situation.
Sometimes such public policy is declared by constitution ;' sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people— in their clear consciousness and conviction of what is naturally and inherently just and right between man and man.
It regards the primary principles of equity and justice and is sometimes expressed under the title of social and industrial justice, as it is conceived by our body politic.
When a course of conduct is cruel or shocking to the average man’s conception of justice, such course 'of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be constitution, statute or decree of court.
It ■ has frequently been said that such public policy is a composite of constitutional provisions, statutes and judicial decisions, and some courts have gone so far as to hold that it is limited to these. The obvious fallacy of such a conclusion is quite apparent from the most superficial examination.
*69 When a contract is contrary to some provision of the constitution, we say it is prohibited by the constitution, not by public policy. When a contract is contrary to a statute, we say it is prohibited by a statute, not by a public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy.
Public policy is the cornerstone — the foundation — of all constitutions, statutes and judicial decisions; and its latitude and longitude, its height and its depth, greater than any or all of them. If this be not true, whence came the first judicial decision on matter of public policy? There was no precedent for it, else it would not have been the first.
This is recognized in three well-known and well-considered Ohio cases, The Central Ohio Salt Co. v. Guthrie, 35 Ohio St., 666; State, ex rel., etc. v. The Bell Telephone Co. et al., 36 Ohio St., 296, and L. S. & M. S. Ry. Co. v. Spangler, 44 Ohio St., 471.
The state has a high and vigilant regard for the life, health and safety of its citizenship, as is evidenced by the variety and number of its laws specially enacted to conserve the same. A person may not take his own life. A person’s life cannot be wrongfully taken by another; that is prohibited by the statutes against homicide. One person may not .deprive another of limb, or assault him, from the slightest to the most aggravated degree, without incurring the penalties of the law.
*70 Coming now more specifically to the large class of persons involved in the case at bar, the employer and the employe:
As undoubted evidence of this broad humanitarian policy of the state to safeguard the life, limb, health and safety of its people employed in the industrial world, the people of Ohio in 1912 by an overwhelming vote adopted an amendment to the Ohio Constitution known as Section 34, Article II, which reads: “Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employes; and no other provision of the constitution shall impair or limit this power.”
Another amendment of the same nature was adopted by the people at the same time, known as Section 35, of said Article II, providing among other things for workmen’s compensation, “and taking away any or all rights of action or defenses from employes and employers; but no right of action shall be taken away from any employe when (.he injury, disease or death arises from failure of the employer to comply with any lawful requirement for the protection of the lives, health and safety of employes.”
Statute after statute has been enacted imposing the duty upon the employer to provide a reasonably safe place for the employe to work, reasonably safe ways to and from such place of employment, reasonably safe tools and appliances, reasonably safe protection from dangerous machinery, and the like, together with numerous provisions for light, heat, *71 sanitation, etc., all with a view of safeguarding the life, limb, health and safety of the employe. All these constitutional provisions and statutes are bottomed upon that broad humanitarian public policy, to-wit, the state’s high and vigilant regard for the safety of life, limb, health and general welfare of its people, particularly the working class..
The irresponsible taking of human life or limb or health is not allowed by the state, or any of its agencies, when the same is directly and deliberately attempted by any individual or class of individuals as against any individual or class of individuals. Such a proposition is so atrocious and offensive that all men must recoil therefrom arid repudiate the same. If such a course of conduct between individuals may not prevail directly and deliberately, by what species of judicial jugglery shall it be permitted to result from the indirect and passive methods known as negligence, carelessness, failure to take any regard whatsoever for the safety, life or limb of others, even though such be expressly provided for in the so-called contract of employment.
Why should a court recognize in any person, artificial or natural, the right to do a wrong to some other person? How can it be said to be the right of one person, whether by contract or otherwise, to take the life or limb of another person wrongfully and negligently, and wholly without liability or responsibility for such wrongful and negligent act?
If a contract between employer and employe, whereby the employe assumes all risks no matter *72 how negligent the employer may be, must be upheld by courts as a valid contract, the enormous increase in industrial casualties, 'the loss of life and limb that would suddenly and inevitably follow, would be almost inconceivable. We would have a veritable army of crippled unfortunates and maimed dependents, deprived of life’s joys and blessings, filling our almshouses as paupers and charges upon the state’s financial resources, entailing a burdensome system of taxation. Wholly apart from the higher humanitarian questions involved, the increased burden thus placed upon the state for charitable purposes would be, in and of itself, sufficient to affect contracts of this character with a vital public interest. Courts should not hesitate to hold such contracts wholly null and void.
Therefore, upon the general fundamental principles of public policy upon which the Ohio Constitution and its laws are founded, as well as from the spirit of many of our constitutional principles, such a policy as is contained in the Pullman Company contract in the case at bar is clearly in conflict with the sound and humane public policy of the state.
But it is claimed that contracts of this character are no longer open to doubt; that they have -been adjudicated and held valid by the federal courts. The chief case relied on by plaintiff in error to sustain this contention of validity is that of Robinson v. Baltimore & Ohio Rd. Co., 237 U. S., 84. The opinion is by Mr. Justice Hughes.
Plaintiff in error claims that that case is squarely in point and decisive of this cause in favor of plaintiff in error. An examination of that case *73 discloses the fact that the suit was brought for personal injuries “under the Employers’ Liability Act.” That act applied only to employers and employes in railway service engaged in interstate commerce, and the question was whether or not a person employed by the Pullman Company was an employe of the railroad company within the purview of said act. This is apparent from the second and third paragraphs of the syllabus, which respectively read:
‘A contract between the Pullman Company, as employer, and its employe releasing the employer, and also all railroad corporations over whose lines the employer’s'cars were operated, from all claims for liability in personal injury sustained by the employe, held in this case valid unless the employe of the Pullman Company was also the employe of the railroad company, in which case that provision of the contract would be invalid under §5 of the Employers’ Liability Act.”
’ “Congress in legislating on the subject of carriers by rail was familiar with the situation and used the term employe in its natural sense and did not intend to include as employes of the carrier persons on interstate trains engaged in various services for other masters.”
It is quite apparent that that suit being brought under the employers’ liability act was governed by the provisions of that act and that the word “employe,” as therein used; did not include persons who were not employes of the railway company, and therefore that the act did not include and protect a *74 porter, employed by the Pullman Company, in charge of a Pullman car.
The opinion is brief and clear and fully discloses the fact that the whole question turned upon the construction of that statute and the use of the word “employe” therein. No question of public policy seems to have been raised in that case, at least it is in no wise discussed in the opinion. The Robinson case has no application here.
It may be said in passing that it is also claimed in the case at bar that Mary Kinney was at least a de facto employe of the plaintiff in error, the railway company, and that, therefore, by virtue of Section 9013, General Code, said contract was invalid.
That section reads as follows:
“No railroad company insurance society or association, or other person shall demand, accept, or enter into an agreement or stipulation with a person about to enter, or in the employ of a railroad company whereby he stipulates or agrees to surrender or waive any right to damages against a railroad company, thereafter arising for personal injury or death, or whereby he agrees to surrender or waive in case he asserts such right, any other right.”
As in the Robinson case, under the federal statute, so in this case, under the Ohio statute, the employe is clearly not within the terms of the statute. She was not an employe of a railroad company, and, as such, the statute in and of itself has no application.
*75 The case, however, particularly relied upon by plaintiff in error as controlling and decisive of the case at bar, is known as the Voigt case, reported in 176 U. S., 498, 44 L. Ed., 560. The opinion is by Mr. Justice Shiras. The syllabus in the latter publication reads as follows:
“An express messenger occupying an express car, in charge of express matter, in pursuance of a contract between the railroad company and the express company, is not a passenger within the meaning of the rule of public policy which denies the validity of contracts limiting the liability of a carrier to a passenger for negligence, and cannot recover of the railroad company for injuries sustained in a collision, where the contract between the companies exempts the railroad company from such liability, while his own contract, voluntarily entered into as a condition of employment, assumes all such risks and stipulates that he will indemnify and hold his employer harmless from all liability for such accident or injury.”
If this is sound doctrine it would seem at first blush to sustain the claims of plaintiff in error. In the opinion Justice Shiras says, at page 505:
“The Circuit Judge thought the case could not be distinguished from the case of Railroad Co. v. Lockwood, 17 Wall. 357, where a recovery was maintained by a drover injured whilst travelling on a stock train of the New York Central Railroad Company proceeding from Buffalo to Albany, on a pass which certified that he had shipped sufficient stock to give him a right to pass free to Albany, but which provided that the acceptance of the pass *76 was to be considered a waiver of all claims for damages or injuries received on the train. This court held that a drover travelling on a pass, for the purpose of taking care of his stock on the train, is a passenger for hire, and that it is not lawful for a common carrier of such passenger to stipulate for exemption from responsibility for the negligence of himself or his servants. This case has been frequently followed, and it may be regarded as establishing a settled rule of policy. * * *
“The principles declared in those cases are salutary, and we have no disposition to depart from them.”
Mr. Justice Shiras continuing, on page 506, says:'
“Upon what principle, then, did the cases relied on proceed, and are they applicable to the present one? They were mainly two. First, the importance which the law justly attaches to human life and personal safety, and which therefore forbids the relaxation of care in the transportation of passengers which might be occasioned by stipulations relieving the carrier from responsibility. This principle was thus stated by Mr. Justice Bradley in the opinion of the court in the case of Railroad Co. v. Lockwood: Tn regulating the public establishment of common carriers, the great object of the law was to secure the utmost care and diligence in the performance of their important duties — an object essential to the welfare of every civilized community. Hence the common law rule which charged the common carrier as an insurer. Why charge him as such? Plainly, for the purpose of raising the most stringent motive for the exercise *77 of carefulness and fidelity in his trust. In regard to passengers the highest degree of carefulness and diligence is expressly exacted. In the one case the securing of the most exact diligence and fidelity underlies the law, and is the reason for it; in the other, it is directly and absolutely prescribed by the law. It is obvious, therefore, that if a carrier stipulate not to be bound to the exercise of care and diligence, but to be at liberty to indulge in the contrary, he seeks to put aside the essential duties of his employment. And to assert that he may do' so seems almost a contradiction in.terms.’
“The second fundamental proposition relied on to nullify contracts to relieve common carriers from liability for losses or injuries caused by their negligence is based on the position of advantage which is possessed by companies exercising the business of common carriers over those who are compelled to deal with them. And again we may properly quote a passage from the opinion in the Lockwood case as a forcible statement of the situation:
“ ‘The carrier and his customer do not stand on a footing of equality. The latter is only one individual of a million. He cannot afford to higgle or stand out and seek redress in the courts. His business will not admit such a course. He prefers, rather, to accept any bill of lading, or sign any paper the carrier may present; often, indeed, without knowing what the one or the other contains. In most cases he has no alternative but to do this, or abandon his business. * * * If the customer had any real freedom of choice, if he had a reasonable or practicable alternative, and if the em *78 ployment of the carrier were not a public one, charging him with the duty of accommodating the public in the line of his employment, then, if the customer chose to assume the risk of negligence, it could with more reason be said to be his private affair, and no concern of the public. But the condition of things is entirely different, and especially so under the modified arrangements which the carrying trade has assumed. The business is almost concentrated in a few powerful corporations, whose position in the body politic enables them to control it. They do, in fact, control it, and impose such conditions upon travel and transportation as they see fit, which the public is compelled to accept. These circumstances furnish an additional argument, if any were needed, to show that the conditions imposed by common carriers ought not to be adverse, to say the least, to the dictates of public policy and morality.’ ”
Justice Shiras continues:
“Upon these principles we think the law of to-day may be fairly stated as follows: 1. That exemptions claimed by carriers must be reasonable and just, otherwise they will be regarded as extorted from the customers by duress of circumstances, and therefore not binding. 2. That all attempts of carriers, by general notices or special contract, to escape from liability for losses to shippers, or injuries to passengers, resulting from want of care or faithfulness, cannot be regarded as reasonable and just, but as contrary to a sound public policy, and therefore invalid.”
Justice Shiras further continues:
*79 “But are these principles, well considered and useful as they are, decisive of, or indeed applicable to, the facts presented for judgment in the present case ?
“We have here to consider not the case of an individual shipper or passenger, dealing, at a disadvantage, with a powerful corporation, but that of a permanent arrangement between two corporations embracing within its sphere of operation a large part of the transportation business of the entire country. We need not, in this inquiry, examine the nature of the business of an express company, or rehearse the particular services it renders the public.”
In the Voigt case the United States Express Company had a contract with the Baltimore & Ohio Southwestern Railway Company very similar to the contract in the case now before this court.
Justice Shiras undertakes to distinguish between a contract made by the railroad company as an employer with its employe and a contract made between an express company and railway company, or between the Pullman Company and a railway company.
He says, at page 512, “that Voigt, the defendant in error, had agreed in writing to indemnify the express company against any liability it might incur by reason of said agreement between the companies, so far as he was concerned, and further agreed to release the railroad company from liability for injuries received by him while being transported in the express cars; that, in consideration of such agreement on his part, Voigt was employed *80 as an express messenger, and while so employed, and while occupying as such messenger a car assigned to the express company, received injuries occasioned by a collision, on December 30, 1895, between the train which was transporting the express car and another train belonging to the same railroad company.”
Mr. Justice Shiras continues:
“It is evident that, by these agreements, there was created a very different relation between Voigt and the railway company than the usual'one between passengers and railroad companies. Here there was no stress brought to bear on Voigt as a passenger desiring transportation from one point to another on the railroad. His occupation of the car, specially adapted to the uses of the express company, was not in pursuance of any contract directly between'him and the railroad company, but was an incident of his permanent employment by the express company. He was on the train, not by virtue of any personal contract right, but because of a contract between the companies for the exclusive use of a car. His contract to relieve the companies from any liability to him, or to each other, for injuries he might receive in the course of his employment, was deliberately entered into as a condition of securing his position as a messenger. His position does not resemble the one in consideration in the Lockwood and similar cases, where the dispensation from liability for injuries was made a condition of a transportation which the passenger had a right to demand, and which the railroad companies were under a legal duty to furnish.”
*81 Mr. Justice Shiras, in reviewing the Lockwood and other cases, bottoms the judgment of the court, holding that such contracts are invalid because contrary to public policy, upon the two following propositions:
“First, the importance which the law justly attaches to human life and personal safety.
“Second, advantage which is possessed by companies exercising the business of common carriers over those who are compelled to deal with them.”
Justice Shiras bases these propositions very largely upon the reasoning of Mr. Justice Bradley in the Lockwood case, which he again quotes, as follows:
“The carrier and his customer do not stand on a footing of equality. The latter is only one individual of a million. He cannot afford to higgle, or stand out and seek redress in the courts. * * * In most cases, he has no alternative but to do this, or abandon his business. * * * If the customer had any real freedom of choice, if he had a reasonable and practicable alternative, and if the employment of the carrier were not a public one, * * * then, if the customer chose to assume the risk of negligence, it could with more reason be said to be his private affair, and no concern of the public. But the condition of things is entirely different, and especially so under the modified arrangements which the carrying trade has assumed. The business is mostly concentrated in a few powerful corporations, whose position in the body politic enables them to'control it,”
*82 Now Mr. Justice Shiras attempts to make some surface distinctions between the contract that the railroad company had with the express company as to its messenger in the Voigt case and the contract which the railroad company had with the drover in the Lockwood case. These distinctions are at the most surface distinctions, technical distinctions. At the bottom there is no real difference in principle. Can it be said “that the importance which the law justly attaches to human life and personal safety” applies to a drover but does not apply to an express messenger, and does not apply to an employe such as the car cleaner, Mary Kinney? This sort of leopard-spot public policy which Justice Shiras attempts to lay down in the Voigt case is wholly indefensible and unconscionable.
The law regards with equal tenderness and concern the life of the passenger, rich or poor, the life of the drover, the life of the express messenger, the life of a Pullman porter, the life of a car cleaner. It may and should recognize different degrees of care, dependent upon the relation and circumstances of the parties, and the law does recognize such distinctions, but to say that the parties may so contract as to permit one to avoid and escape all thought oleare for the safety of the life, limb or health of the other is as barbarous a policy as was ever suggested in any court of justice.
Does the state’s regard for human life and its conservation, with consequent liability for its wrongful loss or impairment, rest on one public policy for a drover, another public policy for an expressman, another public policy for a Pullman *83 porter, and yet another public policy for a car cleaner ?
Richard Hooker, in his definition of law, used these immortal words, among others:
“All things in Heaven and earth do her [the law] homage, the very least as feeling her care and the greatest as not exempt from her power.”
The quoted language of Justice Bradley in the Lockwood case applies with no more force there than it does in the Voigt case, or than it does in the Kinney case at bar. Substitute for “drover” the word “expressman,” or, as in this case, the words “car cleaner” or the word “employe,” and you have the same public policy — varying in circumstances, it is true, but nevertheless the same public policy for which Justice Bradley so ably and vigorously contends, to-wit, the state’s high regard for the safety of human life.
Now applying the second ground of that public policy recognized by Justice Bradley in the Lockwood case, to-wit, the inequality of the parties to the contract, if here we substitute for the word “drover” the word “porter,” “expressman” or “car cleaner,” is there not indeed a greater inequality in the case at bar between Mary Kinney, the car cleaner, and the Pullman Company than there was in the Lockwood case between the shipper, called the drover, and the railway company? Indeed the very doctrine announced by Mr. Justice Bradley in the Lockwood case, and quoted with high approval by Mr. Justice Shiras in the Voigt case, should have persuaded the court in the latter case to a judgment absolutely contrary to the one rendered.
*84 Abraham Lincoln in his great message to the federal congress, delivered on July 4, 1861, among other things said that “the leading object of government * * * is to elevate the condition of men.” To that paramount purpose and policy all the agencies and branches of government, including the judiciary, are thoroughly committed. We are now asked to substitute for that fundamental policy a contractual doctrine that endangers the condition of men, makes widows of their wives, orphans of their children, destroys or impairs their usefulness as citizens and their earning capacity as workers, and all because it has been so written in a contract, the parties to which are upon such unequal terms that there is no more liberty of contract in this case — indeed not as much — than there was in the Lockwood case between the drover and the railway company. That contract was found invalid as against Lockwood. This contract should be likewise held invalid as .against Mary Kinney.

Judgment affirmed.

Nichols, C. J., Johnson, Donahue, Newman, Jones and Matthias, JJ., concur.