**Harold Crane et al. Appellees, v. Railway Express Agency, Inc. et al., Appellants.**

**Gen. No. 9,072.**

330

Opinion filed January 17, 1938.   Remittiturs filed January 20, 1938.

HILL & BULLINGTON, of Hillsboro, for appellants; K. L. RICHMOND and A. M. HARTUNG, of counsel.

DRYER, BROWN & POOS, of Hillsboro, for appellees; BARTLETTE E. NUTTER, of counsel.

MR. JUSTICE DAVIS delivered the opinion of the court.

A complaint was filed by Harold Crane, William Lauscher, Merivel Tucker, Charles E. Baker, Ralph Flynn and Emil Santiago, plaintiffs appellees, against the Railway Express Agency, Incorporated, and Charles M. Thomson, trustee of the estate of Chicago and Eastern Illinois Railway Company, defendants appellants, for the recovery of damages for personal injuries, each plaintiff alleged he had received through the negligence of defendants.

The complaint alleges that the cause of action of each of the plaintiffs arose out of the same transaction and as a result of the same negligent acts of the defendants; that both defendants were engaged as common carriers in interstate commerce, the express agency in the carriage and transportation of express and the railway company in the conveyance and transportation of freight and express; that on September 20, 1935, said railway company was carrying on its passenger

train No. 21 a railway express car under a contract between the express agency and Charles M. Thomson, trustee.

That on said date plaintiffs were employed by Motor City Stables in managing, caring for and riding certain race horses owned by said Motor City Stables; that on September 19, 1935, said Motor City Stables applied to defendant express agency, at its Detroit, Michigan, office for the carriage of 15 race horses and traps, including the carriage and transportation of plaintiffs, as servants and attendants to said animals, from Detroit, Michigan, to Dallas, Texas; that said express agency entered into a contract, plaintiffs' exhibit A, made a part of the complaint, and thereby agreed with Motor City Stables and plaintiffs to carry said race horses and traps and plaintiffs from Detroit to Dallas upon the payment of $600, which was paid by Motor City Stables to said Railway Express Agency.

In addition to the foregoing allegations of the complaint it contained six counts, in count one of which the plaintiff, Harold Crane, alleges that on September 20, 1935, while he was being transported as a passenger for hire in the express car of the defendant, Railway Express Agency, over the lines of Chicago and Eastern Illinois Railway Company near the village of Schram City, Montgomery county, Illinois, the train which included the express car of the defendant, Railway Express Agency, was so negligently and carelessly operated and managed by the defendants and their servants, in the control thereof, that the same left the tracks and overturned, and as a result thereof, through no negligence of his own, he was injured and damaged in the sum of $10,000.

Then follows five additional counts, in which the remaining plaintiffs, in separate counts, make the same allegations as is contained in count one with the exception of the allegation as to injuries and damages sustained.

Exhibit A, attached to and made a part of the complaint, was a uniform live stock contract, for transportation of animals other than ordinary live stock. It was entered into between Railway Express Agency and Motor City Stables and provides for the transportation and shipment of 15 race horses and traps from Detroit, Michigan, to Dallas, Texas. Sec. 7 thereof provides that when animals are accompanied by the owner, or attendant in his employ, the shipper shall load and unload said animals at his own risk, and take care of and feed and water the animals while being transported and the company shall not be under any liability or duty with reference thereto, except in the actual forwarding thereof. Attendants when transported free will be permitted to ride only in the car in which the animals are transported or in smoking cars.

Sec. 8 provides that the shipper, in consideration of the free carriage of a person or persons, as his agent, in charge of said animals, agrees to indemnify and save harmless the company from all claims by reason of personal injuries sustained by said person or persons so in charge of said animals, whether caused by negligence or not.

"Attendants' Contract," attached to exhibit A, provides that, whereas it is necessary that the owner or some person on his behalf shall accompany and take charge of said animals, and in consideration of the free transportation of the attendants, upon the same train upon which the animals are transported, said transportation being performed at the instance and request of the attendants, and it being made known to each of the undersigned that each express company does, by contract, agree to hold each of the railroad companies, over which the undersigned is being transported, harmless against any injury or damage to the undersigned while being transported, as therein set forth, each of the undersigned agrees that each of the carriers or railroad companies, mentioned in the foregoing con-

tract as to the transportation of the undersigned attendants, is to perform a service not required of a carrier of passengers and not required of a common carrier, and as to such transportation each of said carriers, express companies and railroad companies, is and shall be liable only as a private carrier, and each of the undersigned attendants does severally agree to assume all risk of accident or damage to himself, and does hereby release and discharge said Railway Express Agency and any connecting express company and any railroad company which may at any time be engaged in transporting or forwarding said animals and said attendants, from all claims, liabilities and demands of every kind, on account of any injury or damage.

Defendants answered the complaint, admitting that Motor City Stables applied to the Railway Express Agency for carriage of 15 horses and traps from Detroit, Michigan, to Dallas, Texas. Alleged they agreed to convey said horses and traps for the consideration authorized to be charged and in the manner set forth in the contract, ''Plaintiffs' Exhibit A,'' attached to the complaint. Deny that for any consideration they agreed to carry plaintiffs but that they were permitted to accompany the shipment in accordance with the ''Attendants' Contract,'' signed and set forth in ''Plaintiffs' Exhibit A,'' and not as a passenger nor for any consideration paid by them, and agreed only to permit said parties to attend the horses so shipped without liability on the part of either defendant, deny the allegations of negligence charged in each count, and deny that plaintiffs are entitled to any judgment for damages or injuries received by them.

Defendants as special matters of defense allege that the plaintiffs, at the time of entering into the contract for the shipment of the horses and traps mentioned in ''Plaintiffs' Exhibit A,'' signed a contract with defendant, Railway Express Agency (''Attendants' Con-

tract" quoted verbatim), and if either of the plaintiffs sustained any injury of any kind, they are, by reason of said contract, barred from recovery.

Defendants also allege in their answer that the plaintiffs entered into a contract, "Plaintiffs' Exhibit A," prior to entering into said car or upon the train operated by Charles M. Thomson, trustee, in and by which contract each of said plaintiffs specified and agreed to hold the Railway Express Agency and any railroad, over which said car was to be transported, harmless against any injury or damage to said plaintiffs, and alleging the same special matters of defense, as claimed by reason of the execution of "Attendants' Contract."

Defendants further allege that, while conveying said horses in the express car upon the tracks of said railroad in Montgomery county, Illinois, the train was being operated with due care and caution, and as it was approaching a public road crossing, one Ada Dammann so negligently operated and drove her automobile that it came immediately in contact with the front end of the engine and caused the train to be derailed, including the car in which the horses were carried and plaintiffs were riding, and that any injury caused to plaintiffs, or either of them, was because of the negligence of Ada Dammann and not because of the negligence of the defendants.

Plaintiffs moved the court to strike the two sections of the answer, setting forth special matters of defense, and alleging that if any damage or injury occurred to the plaintiffs, or either of them, the same is barred by the terms and conditions of the "Attendants' Contract." The court granted the motion and those portions of the answer were ordered stricken.

In reply to the answer of defendants, plaintiffs denied that the defendants were in the exercise of due care and caution for the safety of plaintiffs, as alleged

in paragraph two of defendants' special defense; that the automobile driven by Ada Dammann, which came in contact with the locomotive of the defendant, did not derail the engine, tender or car in which plaintiffs were riding; that the striking of the automobile by the engine was not the proximate cause of the turning over of the engine and car, but that they turned over through the carelessness and negligence of those in charge of the operation of the engine and train both before and after the engine crossed said public highway.

The jury returned separate verdicts as to each plaintiff, finding defendants guilty and assessing the damages due each. Motions for a new trial and in arrest of judgment were overruled by the court, and separate judgments were entered as to each defendant.

From the evidence it appears that the crossing at which the car of Mrs. Dammann came in contact with the engine of the train on which the car of the express agency was being hauled was what was known as the Codemo or the Smith road crossing, which was at the edge of the village of Schram City, and about a mile north of Hillsboro. The evidence discloses that some 50 or 60 feet south of this crossing there appeared marks on the ties, which were said to have been caused by the wheels of the pony trucks of the engine that had left the rails. From 500 to 600 feet south of the crossing a switch leads off from the southbound main. The train ran on down the track to the switch, and the pony trucks are supposed to have followed the derail and turned the engine over, causing the wreck. Mrs. Dammann, the driver of the car, the engineer and fireman and traveling engineer, who were riding on the engine, were killed. The evidence in the record as to the speed of the train varied from 60 to 75 miles per hour. When the engine came to a standstill the engineer was sitting in the cab with his hands on the bar, the brake valves in emergency position, the sander

valves open and the reverse lever was in neutral position. The evidence is also to the effect that the roadbed and track were smooth and straight and were in good repair.

The position of the plaintiffs is that the car in which they were riding was derailed by reason of the negligence of the defendants in the operation of the train, both before and after crossing the public highway, and that the act of Ada Dammann, in driving on said highway in front of the engine, was not the proximate cause of the derailing of the car in which they were riding. On the other hand, the defendants assert that the testimony shows that the engine was derailed wholly and proximately because of the fact that Ada Dammann negligently drove her car immediately in front of the engine.

The evidence tends to show that Smith road, which was much travelled, runs east and west and the railroad runs in a northeasterly and southwesterly direction and crosses the road at a sharp angle. The roadway is lower than the railroad track as you approach the tracks from the west. There is also evidence in the record as to the conditions of the right of way of the railway company in approaching it on the Smith road from a westerly direction, looking in a northeasterly direction towards Irving.

The evidence of the witnesses, on behalf of plaintiffs, tends to show that you could not see a train until you reached the first track; that there was an embankment about three feet high with tall weeds along the side and top, that were higher than a car; that brush and small trees and telephone and signal poles obscured one's vision and prevented a driver of a car from seeing the approach of a train. The testimony on behalf of the defendants tends to refute this proof. Many witnesses testified on behalf of both parties to the suit on the question as to whether the defendant railroad com-

pany, failed to blow a whistle or ring a bell. The evidence is conflicting as to these questions.

Plaintiffs contending that it was by reason of the negligence of the defendant in failing to keep its right of way free of weeds and brush and in running its train at an excessive rate of speed and failing to give the statutory signals as it approached the Codemo crossing and to keep a proper lookout, that the car driven by Ada Dammann was struck by the defendant's engine and that the negligent striking of said automobile, together with the negligence of the defendant in applying the brakes at the time of the accident, well knowing that the high rate of speed at which the train was traveling, such sudden application of the brakes would cause the locomotive and train to become derailed, and that such negligence of the defendant, both before and after striking the automobile, was the negligence which caused the injury to plaintiffs.

Defendants contend that, until the engine reached the crossing where the automobile was struck, it was running in its usual way on its regular schedule, at a speed not to exceed 60 miles per hour, upon a roadbed and track, the smoothest and straightest and best built and constructed of probably any road in the United States; that it is admitted that the railroad track, roadbed and highway crossing were each and all in good and proper repair; that from the testimony it appears that at no time were the weeds over 18 to 20 inches high, and that they did not reach within 20 feet of the rails and did not obscure a good and proper view of the approach of the train; that the driver of the automobile did actually see the train, and for that reason it was immaterial whether the train whistled or the bell rang; that the automobile driven by Ada Dammann, or some part of it, was struck by the engine and caused the pony trucks to get off of the tracks and

derail the engine; that this was the proximate cause of the accident; that it was unquestionably proven that the proper signals, both as to blowing the whistle and sounding the bell, were given. The evidence refutes the proof that because of weeds, trees and brush the driver of the automobile could not see the approach of the train; that the engineer did all that could properly be done in attempting to stop the train after it struck the automobile.

We are unable to agree that the evidence, when considered as a whole, fails to support the verdict and judgment of the court. We are of opinion that the verdicts of the jury are not contrary to the manifest weight of the evidence.

It is further insisted that the court erred in striking from the answer of the defendants the special defense that the Railway Express Agency was not a common carrier of passengers and also that by contract the defendant's liability for damages by reason of negligence was limited. That it is not alleged that the Railway Express Agency was a common carrier of passengers, and that it did not for any consideration agree to carry plaintiffs as passengers but that they were permitted by the terms of the contract, "Plaintiffs' Exhibit A," to accompany the shipment of horses without liability on the part of either of the defendants. That each of the plaintiffs, prior to taking passage in the car of defendant, Railway Express Agency, entered into "Attendants' Contract," agreeing to assume all risk of accident or damages and relieving the defendants from all claims of every kind on account of damages sustained, whether by negligence or otherwise.

That since the express agency is not a common carrier of passengers it can enter into any contract it may see fit with such persons who accompany shipments of goods, horses or chattels and it is bound only by the

general rules relating to contracts. That the striking of pars. one and four from the answer deprived defendants of the defense therein pleaded.

While plaintiffs may not have alleged specifically that the Railway Express Agency was a common carrier of passengers, yet the complaint contains statements of facts equivalent to the specific allegation that the Railway Express Agency was a common carrier of passengers in the transporting of plaintiffs.

Motor City Stables was in the race horse business and wished to have its horses, traps and attendants to such horses, transported from Detroit, Michigan, to Dallas, Texas, without delay and in order to get such transportation the shipper and its helpers and attendants were required to enter into the contracts, "Plaintiffs' Exhibit A" and the "Attendants' Contract," by the terms of which the Railway Express Agency and all express companies and all railroad companies over which the express car might be transported were released from all liability on account of any damages that might be caused them by the negligence of any such companies.

Defendant, Railway Express Agency, in the carriage of express, accepts for transportation animals other than ordinary live stock, among which are reptiles, mice, rats, colts, and on up to zebras, camels, horses and elephants, and because it is necessary that the owner, or some person on his behalf, shall accompany and take charge of certain of the animals, the owner or his agent is authorized to be transported on the same train on which the express car is carried, riding in the express car or smoking car. In the transportation of such owner or his agent, the Railway Express Agency and railroad company hauling said express car, are common carriers of such person or persons so in charge of such live stock and so being transported.

The evidence discloses that plaintiffs were the agents and servants of Motor City Stables and helped load

the express car at Detroit and were checked in by the
agent of the Railway Express Agency, and upon their
arrival at Chicago the conductor in charge of the train
again checked the attendants.

The uniform live stock contract provides that when
the owner or attendant accompanies the animals he
shall load and unload, take care of, and feed, and water
them and the company shall not be under any liability
or duty with reference thereto except in the actual
forwarding thereof. By this provision the Railway
Express Agency receives valuable services from the
attendants. In addition it received the sum of $600
for transporting the race horses, traps and attendants
from Detroit, Michigan, to Dallas, Texas.

A person, who is traveling with the consent of the
railroad, in charge of stock or goods carried by the
company for him, is a passenger for hire, even when
he is traveling in charge of cattle on a drover's pass.
The consideration of his passage is the service he ren-
ders in taking care of the cattle or the charge made
against him or his employer for shipping the cattle.
*New York C. & St. L. R. Co. v. Blumenthal,* 160 Ill. 40,
43 N. E. 809; *Illinois Cent. R. Co. v. Beebe,* 174 Ill. 13,
50 N. E. 1019.

In the case of *Railroad Company v. Lockwood,* 17
Wall. 357, Lockwood, a drover, was injured while trav-
eling on a stock train of the New York Cent. R. Co.
from Buffalo to Albany. He had cattle in the train
and had been required at Buffalo to sign an agreement
to attend to the loading, transporting and unloading
of them, and received what is called a drover's pass.
The court in its opinion said: "It may be assumed,
*in limine,* that the case was one of carriage for hire;
for though the pass certifies that the plaintiff was en-
titled to pass free, yet his passage was one of the
mutual terms of the arrangement for carrying his
cattle." A person in charge of an interstate shipment
of live stock, traveling on a freight train upon a pass

issued pursuant to the terms of the contract of shipment, as permitted by the Act of June 29, 1906 (34 Stat. at L. 584, chap. 3591, Comp. Stat. 1916, par. 8563) par. 1, which excepts necessary caretakers of live stock from the prohibition against the issuing of any interstate free pass, must be regarded as a passenger for hire. *Norfolk Southern R. Co. v. Chatman,* 244 U. S. 276, 61 L. Ed. 1131.

The provision of sec. 1 of said Act, among other things, providing in substance, that no common carrier shall issue or give any interstate free pass, with certain exceptions, one of which is that it may issue such pass to necessary caretakers of live stock, poultry, milk and fruits.

The Supreme Court of the United States in this case saying, that live stock contracts providing for the transportation of caretakers on free passes were in use as early as 1859, and that they have continued in use up to this time is apparent from many reported cases, notwithstanding the fact, that such transportation has been declared by a long line of decisions not to be "free" in the popular sense, but to be transportation for hire, with all the legal incidents of paid transportation, the carriers of the country have continued to issue it and to designate it "free." With this legal and commercial history before us we must conclude that the designation "free pass," as applied to transportation issued or given by railroad companies to shippers and caretakers of stock, had acquired a definite and well known meaning, sanctioned by the decisions of this court and widely by the decisions of the courts of the various States, long prior to the enactment of June 29, 1906, and that, therefore, Congress must be presumed to have used the designation "free pass" in the sense given to it by this judicial determination when, in par. 1 of that act, by specific exception it permitted the continuance of the then long es-

tablished custom of issuing free transportation or passes to shippers or caretakers of live stock. It results that the "settled rule of policy" established by the *Lockwood* case, and the decisions following it, must be considered unmodified by the act to regulate commerce, and that the plaintiff in charge of his stock, traveling upon a pass permitted to be issued by that act, was a passenger for hire.

Plaintiffs were not carried free, but were passengers for hire, under the laws of Illinois and of the United States, both before and after the passage of the Hepburn Act.

In the case of *Railroad Co. v. Lockwood, supra,* it was said by the court: As the duties and responsibilities of public carriers were prescribed by public policy, it has been seriously doubted whether the courts did wisely in allowing that policy to be departed from, without legislative interference, by which needed modification could have been introduced into the law. A common carrier may, undoubtedly, become a private carrier or bailee for hire when as a matter of accommodation or specific engagement he undertakes to carry something which it is not his business to carry. But when a carrier has a regularly established business for carrying all or certain articles, and especially if that carrier be a corporation created for the purposes of the carrying trade, and the carriage of the article is embraced within the scope of its chartered powers, it is a common carrier, and a special contract about its responsibility does not divest it of the character.

In this case it is admitted that the Railway Express Agency is a corporation organized under the laws of the State of Delaware and engaged as a common carrier in the carriage and transportation of express in interstate commerce over the lines of numerous railroads. The contract entered into for the transportation of the race horses and plaintiffs as agents and

attendants to said animals, from Detroit, Michigan, to Dallas, Texas, was in the form permitted by the Interstate Commerce Commission. It was engaged in the carrying of animals other than ordinary live stock and, because it was necessary that the owner or his agent accompany said animals, he or his agent was permitted to be transported upon the same car on which they were carried.

After having reviewed many cases, the conclusions reached by the court in the *Lockwood* case were: First. That a common carrier cannot lawfully stipulate for exemption of responsibility, when such exemption is not just and reasonable in the eye of the law. Secondly. That it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants. Thirdly. That these rules apply both to carriers of goods and carriers of passengers for hire, and with special force to the latter. Fourthly. That a drover, traveling on a pass, such as was given in this case, for the purpose of taking care of his stock on the train, is a passenger for hire.

A railroad company cannot exempt itself from the exercise of care and diligence in carrying its passengers, cannot, even by contract, limit its liability for injuries to passengers to gross negligence alone. It is responsible for any degree of negligence which is sufficient to cause the injury, whether the negligence be called gross or ordinary. The requirement of such responsibility is demanded upon the grounds of public policy. *Illinois Cent. R. Co. v. Beebe, supra.*

"Attendants' Contract," which was signed by each plaintiff before taking passage, in which he agreed to assume all risks of accident and relieve the defendants from all claims of damage, is void on the ground of public policy, the defendant, Railway Express Agency,

in its relation to plaintiffs being a common carrier of passengers and plaintiffs being passengers for hire.

We are therefore of opinion that the court did not err in striking from the answer of defendants the special defense that the Railway Express Agency was not a common carrier of passengers and that by contract the defendants' liability for damages, by reason of negligence, was limited and that it did not for any consideration agree to carry the plaintiffs as passengers.

Defendants also insist that the court erred in refusing witnesses for defendants to testify and answer questions as to what caused the derailment of the engine and in refusing to admit certain photographs in evidence.

From the brief and abstract of the testimony it is not clear just what questions the court refused to let the witnesses answer. One, William J. Tesch, a road foreman of engines, was produced as a witness on behalf of defendants and was asked to give his opinion, based upon his knowledge and experience and practical operations of railroad engines and of the track, switch and speed of the train, what caused the derailment of the engine. In the abstract the question was as to whether he had an opinion as to what caused the derailment. However, on the theory the witness qualified as an expert and was asked the question as to what caused the derailment of the engine, we are of opinion that the court properly refused to permit the witness to give his opinion.

The claim of defendants is that they were free from negligence, and that Mrs. Dammann negligently collided with the front end of the train, causing the pony trucks under the engine to leave the rails, and that when the switch was reached the pony trucks followed the derail and overturned the engine. The claim of the plaintiffs is that it was the negligent management

of the engine by the servants of defendant railway company, both before and after the automobile was struck, that caused the derailment of the engine, that at the high rate of speed at which the train was traveling the sudden application of the brakes by the engineer caused the locomotive and cars to become derailed.

It was the province of the jury to determine as to whether the negligence of the defendant railway company caused the train to become derailed and thus causing the injury to plaintiffs, and the rule is, that a witness cannot be permitted to give his opinion on the very fact which the jury is to determine. *Schlauder v. Chicago & Southern Trac. Co.,* 253 Ill. 154, 97 N. E. 233. Exhibits L and M, which the court refused to admit, were photographs of trains on the track at or near the scene of the accident, and the court did not err in refusing to let them go to the jury.

It is also contended that the court erred in instructing the jury as to the form of verdicts by not giving them an opportunity to find for or against either of the defendants without finding for or against both of them. The form of verdict was given as to each plaintiff separately, instructing the jury that if they find the issues for plaintiff (naming him), and that the defendants (naming both) are guilty, then the form of your verdict may be, etc., and instructing the jury that if they find for the defendants the form of your verdict may be, etc. We fail to find from an examination of the abstract where any instruction, requesting the court to instruct the jury that, as the evidence might warrant, you may find either or both of the defendants guilty, or either or both not guilty. If the defendants had wished to have such an instruction given to the jury it was their duty to have tendered such instruction to the court, and not having done so they cannot now complain.

It is also complained that the court gave six instructions as to form of verdict, one for each plaintiff, which were exact repetitions with the exception of the name of the plaintiff; that frequent repetitions of the same matter in an instruction is condemned by the courts.

Under our present Practice Act it is permissible for all persons to join in one action as plaintiffs, in whom any right to relief in respect of or arising out of the same transaction or series of transactions is alleged to exist, whether jointly or severally, or in the alternative, where, if such persons had brought separate actions, any common question of law or fact would arise. No application was made by defendants for separate trials because of the fact that such joinder might embarrass or delay the trial of the action. Each separate plaintiff and defendant is permitted under the law to produce such competent evidence as he may deem proper to maintain his contention, and is entitled to have the court instruct the jury as to the separate issues raised by him, and in this case, on the question of damages, evidence was introduced as to the damages sustained by each separate plaintiff on behalf of both the plaintiffs and defendants, and we are of opinion that each plaintiff was entitled to have a separate instruction given in his behalf, and that therefore no error was committed by the court in the giving of identical instructions on that subject.

It is also said that there are several defects in the instruction. The jury were told by this instruction that, in determining the amount of damages which the plaintiff is entitled to recover the jury have a right to, and they should take into consideration, all of the facts and circumstances proven by the evidence before them, the nature and extent of such plaintiff's physical injuries, if any, so far as the same are shown by the evidence, his suffering in body, if any, resulting from

such physical injuries, as the jury may believe from the evidence before them in this cause he has sustained by reason of such injuries.

This instruction does not require that the amount should be based on the evidence as to the damages for which the law allows recovery, but authorizes the jury to take into consideration all of the facts and circumstances proven by the evidence before them, and for that reason was improper.

In considering a similar instruction, which authorized the jury to take into consideration all of the facts and circumstances in evidence in determining the amount of damages, our Supreme Court, in *Garvey v. Chicago Rys. Co.*, 339 Ill. 276, 171 N. E. 271, said: "An instruction which does not require the assessment of damages to be based upon the evidence as to damages for which the law allows recovery, is improper. An instruction embodying the above statement is particularly objectionable when there is more than one party defendant." (The Yellow Cab Co. being a party defendant in the court below, the suit having been dismissed as to it after verdict.) It was further said: "However, this instruction did not stop with the above words, but went on to outline the various elements of injury which may properly be taken into consideration, and the broad generalization of the first statement was, in effect, limited thereby." It was also stated in the opinion, "that the giving of this instruction might not in itself call for a reversal in the case, inasmuch as there must be reversal on other grounds, the error should not be repeated on a new trial."

The instruction under consideration did not stop with the statement, that the jury could consider all of the facts and circumstances in evidence, but went on to outline various elements of injury which might properly be taken into consideration. Although the court should have instructed the jury that the amount

of damages must be based upon the evidence as to damages for which the law allows recovery, yet, we do not consider the giving of this instruction as reversible error, neither did the fact that the instruction informed the jury that compensation may be allowed, etc., ''so far as such damages or injuries, if any, are claimed and alleged in the complaint,'' have a tendency to prejudice the defendants.

Defendants also complained of the action of the court in refusing instructions 1, 2 and 3, offered on their behalf, such complaint however not being urged as to instructions 1 and 2. It is argued, however, that instruction 3 should have been given and that it was error to refuse it. The jury was instructed that unless it found from a preponderance of the evidence that defendants, or either of them, are guilty of the negligence charged, and that such negligence was the cause of the injury to the plaintiff, then they would have no occasion to consider the matter of damages. This instruction might well have been given, but its refusal was not prejudicial to the defendants. *Chicago City Ry. Co. v. Hagenbeck,* 228 Ill. 290, 81 N. E. 1014.

It is argued by the defendants that the verdicts of the jury are excessive and against the weight of the evidence and the result of passion and prejudice.

The fixing of the amount of damages in an action for personal injuries is peculiarly within the province of the jury, there being no legal standard by which to measure the amount of the damages to be awarded. We have carefully considered the evidence pertaining to the injuries received by each of the plaintiffs.

Appellee, Harold Crane, was in a section of the car with six horses, bales of hay and a water barrel on which he was leaning at the time of the accident. He fell into the barrel head first and things fell on top of his shoulders and a horse was standing on top of him and he was unable to get up. He was kicked by a horse

and became unconscious and was there for two and one-half to three hours. Finally the horse was pulled straight up with ropes and he was released. Was taken to the Hillsboro Hospital and treated by Dr. Kimball for a period of two months. He was in bed more than four weeks continuously and was unconscious five days and not in his right mind for a period of two weeks. He sustained a severe shock and contusions and concussion of the brain. Terrible contusions of thigh, shoulders, right-side of chest and back, right hip and thigh. Had a fracture of the coccyx, or tail bone. When he left the hospital he could not raise his right arm. He went to Detroit and was treated by Dr. Sterling until after Christmas. From his examination Dr. Sterling was of opinion that he had suffered a concussion of the brain and that the condition of his right arm evidently followed a contusion or laceration of the brachial plexus, a large nerve supplying the arm and forearm. Crane was unable to work at the time Dr. Sterling saw him. He left Detroit the last of January, 1936, and went to Motor City Stables at San Antonio, Texas. He was unable to work. He went to Hot Springs, Arkansas, and was there about three months and was laid up a month and a half and started to work in March. At the time of the trial he was still bothered with pain in his right shoulder and back and if he had heavy work or lifted his arm above his head it would cramp.

When the train hit the crossing appellee, Emil Santiago, felt a lurch as the wheels of the train went over the ties and something hit his head and threw him on the floor. He came to while on the floor but could not breathe very well. He was in the car about two hours when they pulled him out. He was all bloody and a doctor covered him with blankets and gave him a couple of shots in the arm. He was taken to the hospital. He had a hole in the side of his head. His

wounds were bandaged and stitches were taken to close them. His ribs and breast were smashed in and he was taped from his shoulder on down about four or five ribs. He was almost scalped and had concussion of the brain and lost a lot of blood and was weak, with some degree of shock, was in the hospital four days and then went to Detroit and then came back to the hospital when the plaster was taken off his head and the stitches taken out. He left the tape on his body and shoulder three or four months. Had pains about six months and could lift nothing heavy, as it hurt his shoulder.

We are of opinion that the verdicts of the jury fixing the damages of appellees, Harold Crane and Emil Santiago, are not excessive and are not the result of passion and prejudice and that the judgments should be affirmed.  ·

The judgments of the circuit court of Montgomery county, recovered by plaintiff, Harold Crane, for $5,000 and recovered by plaintiff, Emil Santiago, for $2,500 and against the defendants, Railway Express Agency, Incorporated, and Charles M. Thomson, trustee of the estate of Chicago and Eastern Illinois Railway Company, are each affirmed with costs.

Ralph Flynn had his neck twisted and the back of his head hurt and was kicked by a horse. He could not move his neck very well for three days. He went to the hospital and he testified that Dr. Kimball saw him, although the doctor had no record of having seen him. He suffered for over three weeks with a pain in the back of his neck.

Merivel Tucker had his knee injured and a bump on his head and nicks in his back and was taken to the hospital and saw Dr. Kimball, and then was taken to the Hillsboro Hotel and was there four or five days. His testimony is that when he left he could hardly walk, his leg was bad and his knee swelled up and he

could not kneel on it. He was a race horse groom and it was necessary to use his knee to put bandages on horses. He had contusions and lacerations of the leg below the knee with a severe contusion of the left knee.

Charles E. Baker was hurt in the right temple, the right and back side of head, and was bruised all over and his neck was scratched. He had pain four or five months afterwards and at the time of the trial he still had dizzy spells and his neck bothered him. He went to work for two different persons and had to quit. He had severe dizziness when he stooped over and was bothered with his leg.

William Lauscher was bruised on his back and shoulder and was cut on his hand and cheek and had severe bruises. He was taken to the hospital and was there 25 or 30 minutes, when he was sent to the hotel. Was sore for two weeks and when he galloped a horse sharp pains would shoot through his back.

The amount of damages that each particular plaintiff sustained must of necessity be awarded to him individually. Taking the aggregate amount of damages awarded by the jury to each particular plaintiff, $14,325, and comparing that amount with the sum of $300 to $500, which defendants claim would have been the recoveries for all of the plaintiffs, if the cases fell under the workmen's compensation laws of either of the States of Michigan or Illinois, would not prove that the verdicts were exorbitant and excessive as contended by defendants.

While the verdicts of the jury, in our opinion, in the cases of Ralph Flynn, Merivel Tucker, Charles E. Baker and William Lauscher are larger than mere compensation for the injuries each received will warrant, we are unable to find any evidence that the jury were influenced by passion and prejudice.

If appellee, Ralph Flynn, will, within 10 days from the date of the filing of this opinion, file in this court a

remittitur of $500, the judgment of the circuit court will be affirmed for the sum of $700, said appellee to pay one-twelfth of the costs of this appeal, otherwise the judgment for $1,200 recovered by said appellee, Ralph Flynn, will be reversed and remanded for a new trial, he to pay one-sixth of the costs of this appeal.

If appellee, Merivel Tucker, will, within 10 days from the date of the filing of this opinion file in this court a remittitur of $1,000, the judgment of the circuit court will be affirmed for the sum of $1,500, said appellee to pay one-twelfth of the costs of this appeal, otherwise the judgment for $2,500, recovered by appellee, Merivel Tucker, will be reversed and remanded for a new trial, he to pay one-sixth of the costs of this appeal.

If appellee, Charles E. Baker, will, within 10 days from the date of the filing of this opinion, file in this court a remittitur of $500, the judgment of the circuit court will be affirmed for the sum of $1,000, said appellee to pay one-twelfth of the costs of this appeal, otherwise the judgment for $1,500, recovered by appellee, Charles E. Baker, will be reversed and remanded for a new trial, he to pay one-sixth of the costs of this appeal.

If appellee, William Lauscher, will, within 10 days from the date of the filing of this opinion, file in this court a remittitur of $625, the judgment of the circuit court will be affirmed for the sum of $1,000, said appellee to pay one-twelfth of the costs of this appeal, otherwise the judgment for $1,625, recovered by appellee, William Lauscher, will be reversed and remanded for a new trial, he to pay one-sixth of the costs of this appeal.

*Judgments in favor of Harold Crane and Emil Santiago affirmed. Remittiturs filed by Ralph Flynn, Merivel Tucker, Charles E. Baker, and William Lauscher and judgments affirmed.*